2012 Ark. 177

**Timothy Lamont HOWARD, Petitioner**

v.

**STATE of Arkansas, Respondent.**

**No. CR 00–803.**

Supreme Court of Arkansas.

April 26, 2012.

Jenniffer Horan, Federal Public Defender, Scott W. Braden, Assistant Federal Public Defender, Office of Federal Public Defender, for petitioner.

Dustin McDaniel, Attorney General, David R. Raupp, Senior Assistant Attorney General, Lauren E. Heil, Assistant Attorney General, for respondent.

ROBERT L. BROWN, Justice.

Timothy Lamont Howard petitions this court to reinvest jurisdiction in the Little River County Circuit Court to consider his petition for a writ of error coram nobis. Howard was convicted by a jury of two counts of capital murder and one count of attempted capital murder in connection with the deaths of Brian and Shannon Day and the attack on their then seven-month-old child, Trevor Day, that occurred on or about December 12, 1997. He was sentenced to death plus thirty years and a $15,000 fine on December 9, 1999.

In 2002, this court affirmed his convictions and sentences on all counts. *Howard v. State*, 348 Ark. 471, 79 S.W.3d 273 (2002) (*Howard I* ). Next, Howard filed a Rule 37 petition based on ineffective assistance of counsel, and in 2006, this court remanded the circuit court's denial of Howard's Rule 37 petition in order to permit him to file a properly verified petition. *Howard v. State*, 366 Ark. 453, 236 S.W.3d 508 (2006) (per curiam). (*Howard II* ). We then denied Howard's petition for Rule 37 relief, after it was properly verified. *Howard v. State*, 367 Ark. 18, 238 S.W.3d 24 (2006) (*Howard III* ).

On March 9, 2007, Howard petitioned the federal district court for a writ of habeas corpus. Subsequently, that court granted Howard's motion to hold his petition in abeyance and found that there was good cause to permit him to return to state court to seek relief. On August 10, 2009, Howard filed a second Rule 37 petition with the circuit court, which was dismissed. This court affirmed the dismissal of the second Rule 37 petition on the grounds that Howard failed to move first to recall the mandate. On May 27, 2010, Howard filed a petition to recall the mandate, which this court denied on September 9, 2010. The present petition to reinvest jurisdiction in the circuit court for purposes of error coram nobis relief was filed with this court on October 7, 2010.

In *Howard I*, we set out the facts resulting in Howard's convictions and sentences. On Saturday, December 13, 1997, at 10:30 a.m., the Little River County Sheriff's Department discovered Brian Day's body in the back of a U–Haul truck in Ogden. Brian Day had been beaten and had been shot once in the head with a .38 caliber bullet. Once Brian Day's body was identified, Sheriff Danny Russell of the Department went to notify Shannon Day of her husband's death. At the Day home, he found Shannon Day's dead body under a mattress in a closet in a bedroom. Trevor Day, the Days' seven-month-old child, was found in a zipped bag crying with a cord tied around his neck. The bag was underneath a pile of clothes in one of the bedrooms of the Day home. *Howard I*, 348 Ark. at 476, 79 S.W.3d at 276–77.

Howard was arrested on Wednesday, December 17, 1997, for the capital murders of Brian Day and Shannon Day and the attempted capital murder of Trevor Day. *Id.* at 477, 79 S.W.3d at 277. This court said in *Howard I* that "the most incriminating evidence against Howard was his inappropriate and unexplainable behavior both before and after the discovery of Brian, Shannon, and Trevor Day," and that "[d]uring a period of time before and after the bodies were located, Howard relied on three different girlfriends, their homes, and several vehicles interchangeably to plan and to attempt to conceal his crimes." *Id.*

In addition to his "inappropriate and unexplainable behavior," the State introduced a pair of work boots found two miles from the site where Brian Day's body was found. The boots found were the same size and type that Howard's ex-wife, Vicki Howard, said that she had bought for him. *Id.* at 480, 79 S.W.3d at 279. She thought that she had seen him wearing those boots the day before the murders. *Id.* Jennifer Qualls, a witness for the State, testified that after Howard read a newspaper article describing the boots, he told her his boots "were in the U–Haul and somebody was trying to set him up." There were several Negroid hairs found inside the boots, blood on top of the left boot, and a Caucasian hair found on the outside of the boots.[1] Testimony at trial from a DNA analyst named Charity Diefenbach connected Howard to the Negroid hairs recovered from the boots. An Arkansas State Crime Lab analyst, Kermit Channel, also testified that the blood on the boots came from Brian Day. The Caucasian hair has not been identified. In addition to the DNA evidence, fingerprints matching Howard's fingerprints were found on a Mountain Dew bottle inside the Days' home. *Id.* at 485, 79 S.W.3d at 281.

We first consider the burden of proof and our standard of review for error coram nobis proceedings. Such proceedings are attended by a strong presumption that the judgment of conviction is valid. *Sanders v. State*, 374 Ark. 70, 71, 285 S.W.3d 630, 632 (2008) (per curiam). A writ of error coram nobis is an extraordinarily rare remedy, more known for its denial than its approval. *Id.* at 72, 285 S.W.3d at 632. For the writ to issue following the affirmance of a conviction and sentence, the petitioner must show a fundamental error of fact extrinsic to the record. *Id.* The function of the writ is to secure relief from a judgment rendered while there existed some fact which would have prevented its rendition if it had been known to the trial court and which, through no negligence or fault of the defendant, was not brought forward before rendition of judgment. *Id.*

---

1. Howard is African American.

■ The writ is issued only under compelling circumstances to achieve justice and to address errors of the most fundamental nature. *Id.* We have held that a writ of error coram nobis is available to address certain errors that are found in one of four categories: (1) insanity at the time of trial, (2) a coerced guilty plea, (3) material evidence withheld by the prosecutor, or (4) a third-party confession to the crime during the time between conviction and appeal. *Id.*

■ The proper standard of review for granting permission to reinvest jurisdiction in the circuit court to pursue a writ of error coram nobis is the one used by this court in *Flanagan v. State:*

This court will grant permission for a petitioner to proceed in the trial court with a petition for writ of error coram nobis only when it appears the proposed attack on the judgment is meritorious. In making such a determination, we look to the reasonableness of the allegations of the petition and to the existence of the probability of the truth thereof.

2010 Ark. 140, at 1, 2010 WL 987049 (per curiam). We turn then to the merits of Howard's petition.

## I. *Brady Claim Based on DNA Report in Guilt Phase*

In seeking to reinvest jurisdiction in the circuit court to consider his petition, Howard focuses on the failure of the State to produce a DNA report with Charity Diefenbach's handwritten notes regarding testing conducted on the Negroid hairs found on the work boots. Howard asserts that this failure to produce evidences an apparent violation of his rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and entitles him to a hearing in circuit court to decide the merit of his error coram nobis petition.

The DNA report with Diefenbach's notes was created by Bode Technology Group (Bode), a private laboratory in Virginia hired by the State. At the time of Howard's trial, the Arkansas State Crime Laboratory did not have the capability to conduct mitochondrial DNA (mtDNA) testing on the Negroid hairs recovered from the boots, and so that evidence was sent to Bode for analysis.[2] The Arkansas Crime Lab, however, was able to test the blood that was on the work boots. Kermit Channel, then supervisor of the forensic biology section at the Arkansas Crime Lab, testified that the blood sample taken from the boot was consistent with the blood sample taken from Brian Day.[3]

Channel further testified that mtDNA had to be used to analyze the Negroid hairs instead of nuclear DNA testing, which was used at the Crime Lab to analyze the blood. Channel stated that nuclear DNA is found in the nucleus of white blood cells. He added that nuclear DNA testing can be performed on hairs, if there is sufficient root material attached. If there is not enough root material on the hairs for nuclear DNA testing, mtDNA testing can be performed. MtDNA testing analyzes the mitochondria, an organelle found inside the cells but outside the nu-

---

**2.** MtDNA was in its early stages of usage during Howard's trial. At Howard's trial in 1999, Charity Diefenbach, the Bode analyst, testified that only about fifty labs were doing mtDNA testing. Diefenbach tested three hairs that were sent from the Arkansas Crime Lab to Bode using mtDNA testing. She also performed mtDNA testing on a blood sample taken from Howard.

**3.** Howard does not challenge the DNA findings of the Arkansas Crime Lab regarding the blood on the work boots. His challenge concerns only the handwritten notes on the Bode report analyzing the hairs found in the boots and comparing those hairs to his blood sample.

cleus. Channel told the jury that hair, bone material, and teeth are all items where mtDNA can be used if there is not enough nuclear material for nuclear DNA testing.

At trial, Diefenbach testified that Howard "could not be excluded" as the source of the Negroid hairs. She further testified that "using a published statistical calculation, you could say that 99.8 percent of the population would not match this mitochondrial DNA profile" of the hairs. On cross-examination, Diefenbach testified as follows:

ATTORNEY: Just for point of clarification. 99.8 percent of the people would be excluded from this sequence that were in these hairs, but the Defendant's blood DNA was included and is a match?

DIEFENBACH: That's correct.

The State did not introduce a copy of Diefenbach's report at trial detailing her mtDNA analysis and procedures. Nor did the State, according to Howard, make the full report, including Diefenbach's handwritten notes, available to him during discovery.

The handwritten notes on the report, Howard maintains, describe several extensive errors made by Diefenbach during the mtDNA analysis at Bode. First, he states that the report notes read "cap flipped open while spinning, resulting in sample loss," which, Howard contends, shows that the sample was contaminated and part of the sample was lost. He also points to a second handwritten note in Diefenbach's report, which states that raw data from the first mtDNA sequencing run was lost, and so the entire sample had to be reprocessed. A third handwritten note in the report says that the "right side of the gel did not run properly," and, therefore, the "samples will be re-run." Another handwritten note on the report reads, "all negative controls gave a positive result. An experiment will be done to find the source of the problem." A final handwritten note reads that "all negatives are clean, indicating the previous results were most likely a result of a random, spurious contaminants."

Howard urges that the State's failure to turn over Diefenbach's report with all the handwritten notes during discovery is a clear *Brady* violation. He claims that proof that the mtDNA testing was marred by contamination and botched procedures would have undermined Diefenbach's credibility and greatly reduced the impact of the work boots as evidence against him. Thus, he contends, this court should allow him to pursue a writ of error coram nobis as the appropriate remedy for the State's withholding of this evidence.

There are three elements of a *Brady* violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; (3) prejudice must have ensued. *Sanders*, 374 Ark. at 72, 285 S.W.3d at 633 (per curiam) (citing *State v. Larimore*, 341 Ark. 397, 404, 17 S.W.3d 87, 91 (2000)).

In *Cloird v. State*, this court considered a similar petition to reinvest jurisdiction to pursue error coram nobis relief involving DNA results that were not turned over to the defense prior to trial. 349 Ark. 33, 76 S.W.3d 813 (2002) (per curiam). In 1992, Gary Cloird had been convicted of rape and theft of property. *Id.* at 36, 76 S.W.3d at 815. As grounds for error coram nobis relief, Cloird contended that the State withheld results of a DNA comparison which excluded him as the contributor of samples taken from the victim. *Id.* at 37–38, 76 S.W.3d at 815–16. Cloird attached a laboratory report on forensic testing con-

ducted by the Federal Bureau of Investigation dated July 23, 1992, which was a full month before his trial began. *Id.* at 38, 76 S.W.3d at 816. According to the report, DNA comparisons showed that Cloird was excluded from having contributed to certain samples taken from the victim. *Id.*

While acknowledging that it is possible to commit rape without leaving evidence on which DNA comparisons can be conducted, this court found that the defense could have used the information in the FBI report to bolster its argument before the jury that there was no scientific evidence to support the rape charge. *Id.* As a result, we held that Cloird had stated a possible *Brady* violation, which warranted reinvesting jurisdiction in the circuit court so that he could file a petition for a writ of error coram nobis to determine: (1) whether the DNA test results were available to the State before trial; (2) whether the DNA evidence, if available to the State before trial, was indeed favorable to the defense; (3) whether prejudice ensued to the defense as a result of the State's failure to disclose the DNA test results; (4) whether, if the DNA test results were withheld from the defense, the circuit court could find that there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different; and (5) whether Cloird raised the possible *Brady* violation in a timely manner. *Cloird,* 349 Ark. at 38–39, 76 S.W.3d at 816. This court agreed that vesting jurisdiction in the circuit court was appropriate and instructed Cloird to file his error coram nobis petition within thirty days of the date of the opinion. *Id.*

In the case before us, the DNA tests showed that Howard was not excluded as the contributor of the DNA from the Negroid hairs recovered from the work boots. The handwritten notes in the report, however, indicated several potential errors in the testing. The DNA evidence from the work boots was all important in linking Howard to the murder of Brian Day, and so the possibility that the DNA testing was flawed would support his contention at trial that he did not commit the murders and that the work boots were an attempt to frame him. We conclude that the evidence could be categorized as favorable to Howard or impeaching for purposes of Diefenbach's testimony. *See Sanders,* 374 Ark. at 72, 285 S.W.3d at 633 (per curiam). Accordingly, Howard has met the first requirement of showing an apparently meritorious *Brady* violation.

The second facet of a *Brady* violation requires that the evidence be suppressed by the State, either willfully or inadvertently. *See Sanders,* 374 Ark. at 72, 285 S.W.3d at 633 (per curiam). To comply with *Brady,* the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf. *Cloird,* 349 Ark. at 38, 76 S.W.3d at 816 (per curiam); *see also Strickler v. Greene,* 527 U.S. 263, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) and *Larimore,* 341 Ark. 397, 17 S.W.3d 87. The rule set out in *Brady* also encompasses evidence known only to police investigators and not to the prosecutor. *Newman v. State,* 2009 Ark. 539, 354 S.W.3d 61, 69 (per curiam) (citing *Strickler,* 527 U.S. 263, 119 S.Ct. 1936).

The report at issue was not introduced at trial, and no copy of it is in the trial record. Furthermore, there is nothing in the record to indicate that Howard ever received a copy of Diefenbach's report with her handwritten notes, despite the fact that his counsel filed a pretrial motion for discovery requesting all records and reports of forensic or scientific examinations, investigations, and analysis undertaken in connection with the investigation

or preparation of this case on August 27, 1998. On November 23, 1998, the circuit court ordered the Arkansas State Crime Laboratory and Medical Examiner's Office to provide the "Arkansas Public Defender Commission with copies of any and all documentation and/or laboratory reports." We conclude that Howard has met the second prong of a *Brady* claim and has shown, at least on the face of his petition, that there is apparent merit to the claim that the State suppressed the evidence either inadvertently or willfully.

The final facet of a *Brady* claim is prejudice. Howard must be able to show that he suffered prejudice as a result of the suppression. *Sanders*, 374 Ark. at 72, 285 S.W.3d at 633 (per curiam). Howard's contention at trial was that he was actually innocent of the murders of Brian and Shannon Day and the attempted murder of Trevor Day. The State relied on the Negroid hairs and blood from the work boots, along with the testimony of Vicki Howard and Jennifer Qualls, to connect Howard to Brian Day's murder. Because Diefenbach's testimony was the only testimony concerning the DNA analysis of the Negroid hairs, her testimony was vital to establishing that DNA link. Howard could have used the handwritten notes to attack Diefenbach's findings that he was not excluded as the source of the hair. *See Cloird*, 349 Ark. 33, 76 S.W.3d 813 (per curiam). Thus, Howard has made an apparently meritorious claim that he suffered prejudice as a result of the suppression.

There remains the question raised by the State of whether a petitioner seeking to reinvest jurisdiction in the trial court to consider a writ of error coram nobis must show this court more than the fact that an apparent *Brady* violation occurred. The State contends that this court will not grant a petition to proceed with error coram nobis relief if the claims presented lack apparent merit. That is correct, but the State goes further. According to the State, to merit relief in this court, a petitioner must demonstrate before reinvestment in the circuit court, and this court must find, that there is a reasonable probability that the judgment of conviction would not have been rendered, or would have been prevented, had the information been disclosed at trial.

The reasonable-probability standard proposed by the State applies to the circuit court's evaluation of the merits of the error coram nobis petition and not to this court's decision to grant or deny permission to proceed with filing the petition in circuit court. *See, e.g., Newman*, 2009 Ark. 539, at 19, 354 S.W.3d 61, 71 ("With respect to the claim of *Brady* violations, the circuit court must determine ... whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."). Again, this court will grant permission for a petitioner to proceed in the circuit court with a petition for writ of error coram nobis when it appears the proposed attack on the judgment is meritorious. *Flanagan*, 2010 Ark. 140, 2010 WL 987049; *Fudge v. State*, 2010 Ark. 426, at 2, 2010 WL 4354240 (per curiam). In making such a determination, the court looks to the reasonableness of the allegations of the petition and to the existence of the probability of the truth thereof. *Id.*

In the instant case, an evidentiary hearing is required in circuit court to determine if the writ should be granted. In *Buckley v. State*, the petitioner, Gyronne Buckley, filed to reinvest jurisdiction in the circuit court to consider a writ of error coram nobis based on an alleged *Brady* violation. 2010 Ark. 154, at 1, 2010 WL 1255763 (per curiam). Although the petition had previously been denied, this court

granted Buckley's second petition to proceed with an error coram nobis petition. This court stated that we will grant permission to proceed with an error coram nobis petition only when the proposed attack on the judgment is meritorious. *Id.* at 2. In determining whether the proposed attack is meritorious, this court looked to the reasonableness of the allegations of the petition and the existence of the probability of the truth thereof. *Id.* We then rejected the State's contention that Buckley had failed to establish that there is a reasonable probability that the judgment would not have been rendered had the withheld evidence been known to the defense at the time of trial. *Id.* Instead, this court determined that "it cannot be determined *without an evidentiary hearing* that the allegations of a *Brady* violation are without merit." *Id.* (emphasis added). As a result, this court reinvested jurisdiction in the circuit court to consider the merits of Buckley's petition. Similarly, in the case before us, we will reinvest jurisdiction in the circuit court to proceed with an evidentiary hearing, assuming Howard has been diligent in bringing his petition, as discussed below.

We turn then to the issue of the timeliness of Howard's petition. While there is no specific time limit for seeking a petition for a writ of error coram nobis, due diligence is required in filing a petition for relief, and in the absence of a valid excuse for delay, the petition will be denied. *Webb v. State*, 2009 Ark. 550, at 4, 2009 WL 3681656 (per curiam). Due diligence requires that (1) the defendant be unaware of the fact at the time of trial; (2) the defendant could not have, in the exercise of due diligence, presented the fact at trial; and (3) upon discovering the fact, the defendant did not delay bringing the petition. *Id.*

In the past, this court has determined, on occasion, whether a claim was brought diligently as a matter of law. *See, e.g., Flanagan v. State*, 2010 Ark. 140, 2010 WL 987049 (per curiam); *see also Echols v. State*, 354 Ark. 414, 125 S.W.3d 153 (2003). In *Flanagan*, we held that the petitioner was not diligent in bringing her claims of mental illness because the grounds for the writ were known or could have been known at the time of trial. Likewise, in *Echols*, this court held that the petitioner was not diligent in pursuing claims that he was incompetent to stand trial. The medical records the petitioner relied on in *Echols* were not only available at the time of trial but were also introduced at trial and were considered by the jury. In these cases, the diligence issue could be decided as a matter of law. Thus, these cases are distinguishable from the cases where petitioners present apparently meritorious *Brady* claims based on information that was not disclosed prior to trial.

Where an error coram nobis claim has apparent merit, this court has often left it to the circuit court to determine the factual issue of diligence. *See Cloird*, 349 Ark. at 38, 76 S.W.3d at 816 (per curiam) ("[F]inally, coram nobis proceedings require the petitioner to show that he proceeded with due diligence in making application for relief. Accordingly, the trial court should consider whether petitioner raised the possible *Brady* violation in a timely manner.") (internal citations omitted); *see also Larimore v. State*, 327 Ark. 271, 281–82, 938 S.W.2d 818, 823 (1997) ("As the trial court considers whether to grant the writ, the following guidelines are applicable ... (4) Due diligence is required in making an application for relief, and, in the absence of a valid excuse for delay, the petition will be denied.").

Because this court concludes that the *Brady* claim based on the DNA report

with the handwritten notes appears to have merit and because we cannot say that the diligence issue can be decided as a matter of law, we reinvest jurisdiction in the circuit court and instruct that court to determine the timeliness of the petition. The diligence decision by the circuit court should be based on what information was available, when it was made available, and what information was concealed or suppressed. These are factual determinations that are essential in deciding whether diligence was employed in filing the petition for the writ. *Larimore*, 327 Ark. at 282, 938 S.W.2d at 823.

In sum, Howard's claim of a possible *Brady* violation has apparent merit that warrants reinvesting jurisdiction in the circuit court so that he may pursue a petition for writ of error coram nobis. Although the State claims that Howard has not diligently pursued his *Brady* claim, that issue is fraught with factual questions that must first be evaluated and then decided by the circuit court upon reinvestiture. *See Cloird*, 349 Ark. at 39, 76 S.W.3d at 816 (per curiam).

## II. *Additional Claims in Guilt Phase*

Howard presents seven additional claims relating to the guilt phase of his trial, which he contends separately as well as collectively warrant reinvesting jurisdiction in the circuit court to pursue error coram nobis relief. We will address the claims seriatim.

### A. Report of Lisa Sakevicius

Howard first contends that the State failed to disclose the existence of a report made by Lisa Sakevicius, a criminalist for the Arkansas State Crime Laboratory, analyzing wood particles found on the same work boots. According to Howard, the report concluded that the wood particles did not match the door of the Days' home. Howard maintains that the State introduced photographs which made it appear that the door had been kicked in before Shannon Day was murdered. Howard has attached a copy of the Sakevicius report to his petition.

Howard is raising a second *Brady* violation based on the failure to disclose the Sakevicius report. The Sakevicius report is dated May 7, 1998, which was more than one year before Howard's trial. Under "Results of the Analysis," the report states "[e]xamination of the slides [from the work boots] revealed no wood fibers similar to those used in construction of the [Days'] door." This report, like the Bode DNA report with the handwritten notes, does not appear to be part of the trial record.

The State maintains that Howard's contention that the Crime Lab report was illegally withheld is barred by the doctrine of res judicata because the circuit already denied Howard's *Brady* claim based on this same allegation during the Rule 37 proceedings. The State, moreover, contends that the possibility that the door to the Days' home was kicked in was not part of the State's case and, therefore, the wood-particle evidence had "no exculpatory value."

The State's res judicata argument is unpersuasive. If an issue was previously litigated at trial, then it is not a proper basis for error coram nobis relief. *O'Neal v. State*, 2010 Ark. 425, at 2, 2010 WL 4366898 (per curiam) (holding that a writ of error coram nobis is only appropriate when an issue was not addressed or could not have been addressed at trial because it was somehow hidden or unknown). But the State contends, in addition, that a *Brady* claim raised in a later Rule 37 petition and ruled on during postconviction proceedings has a res judicata effect if the same claim is asserted in a subsequent petition for error coram nobis relief. That

is not correct. This court has held that error coram nobis proceedings are not interchangeable with proceedings under Rule 37, and issues that could have been raised in postconviction proceedings cannot be the basis for applying the doctrine of res judicata to an error coram nobis petition. *See Mills v. State*, 2009 Ark. 428, at 2, 2009 WL 3162293 (per curiam); *see also Williams v. State*, 289 Ark. 385, 387, 711 S.W.2d 479, 481 (1986) (per curiam). Moreover, as the State acknowledges, *Brady* violations are not cognizable under Rule 37. *Moss v. State*, 2010 Ark. 284, 2010 WL 2210933 (2010), *cert. denied*, ——— U.S. ———, 131 S.Ct. 425, 178 L.Ed.2d 332 (2010) (holding that prosecutorial misconduct is not a claim cognizable in a Rule 37 petition).

It makes no sense to this court that a *Brady* violation for prosecutorial misconduct would be barred by a Rule 37 petition since such a *Brady* claim is not cognizable under Rule 37. Moreover, this court has repeatedly stated that material evidence withheld by the prosecutor is one of the fundamental errors in a trial that warrants error coram nobis relief. *Larimore*, 341 Ark. 397, 406, 17 S.W.3d 87, 92. It would be a complete about face for this court now to hold that a claim of material evidence withheld by the prosecutor, which is not cognizable under Rule 37, could not be the basis for error coram nobis relief.

The State's second argument is that the wood-particle analysis has "no exculpatory value" to Howard. We disagree. A *Brady* violation occurs if the evidence is favorable to the accused because it is either exculpatory or impeaching. *Newman*, 2009 Ark. 539, at 13, 354 S.W.3d 61, 68. Howard maintained at trial that he did not murder the Days. The fact that the wood particles—found on the work boots alleged by the State to be his—did not match the door of the Days' home

appears to support his claim. It is for the circuit court to determine the materiality of that evidence.

Both the Bode and Sakevicius reports concern the work boots, which were a significant part of the State's case at trial. Howard's claims that those reports were withheld have apparent merit and the circuit court could find that there is a reasonable probability that a judgment of conviction would not have been rendered had Howard been able to use them at trial. *Kyles v. Whitley*, 514 U.S. 419, 436, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) (finding that the materiality of suppressed evidence is considered collectively, not item by item). As a result, we grant the petition to reinvest jurisdiction in the trial court to consider the petition for a writ of error coram nobis on this issue.

### B. Danny Merrell

Howard also contends that the State failed to disclose evidence that the police initially suspected a known drug dealer, Danny Merrell, of the murders. Howard concedes, though, that on the second day of trial, criminalist Robert Humphreys testified on behalf of the State that an investigator asked him to compare unknown prints recovered from one of the crime scenes to Danny Merrell. Because this information was known at trial, it is not a proper basis for error coram nobis relief. *O'Neal*, 2010 Ark. 425, at 2, 2010 WL 4366898 (per curiam).

### C. Penny Granger

Howard's next contention is that the State withheld evidence of Penny Granger's longstanding history of mental illness and mental health treatment, pointing to Ms. Granger's suicide in 2000. At trial in 1999, Granger testified that Shannon Day was pregnant by Howard, despite medical evidence that Shannon Day was

not, in fact, pregnant at the time of her death.

When determining whether a *Brady* violation has occurred, it must first be determined that the evidence was available to the State prior to trial and the defense did not have it. *Cloird*, 357 Ark. at 452, 182 S.W.3d at 480. It is not enough to assert that the defense did not have the evidence. *Id.* Rather, the petitioner must also show that the evidence was available to the State prior to trial. In the present case, Howard offers no specific facts to support his claim that the State had access to evidence of Granger's mental-health history. Moreover, her suicide, which occurred in the year following Howard's trial, could not be evidence that was available to the State prior to his trial. As a final point, an application for an error coram nobis petition must make a full disclosure of specific facts relied upon and not merely state conclusions as to the nature of such facts; a naked allegation that a constitutional right has been invaded will not suffice. *Pitts v. State*, 336 Ark. 580, 584, 986 S.W.2d 407, 409 (1999) (per curiam). Howard fails to point to any specific facts that he relies on to support his claim that the State withheld any evidence regarding Granger.

### D.   Brian Day's Arrest

Howard also contends that the State suppressed "highly material" evidence that Brian Day was arrested two weeks before he was murdered. The record shows that Howard's trial counsel was aware that Brian Day may have been arrested, although the circuit court refused to order the State to produce his criminal history.[4] This issue does not qualify as a *Brady* violation because it was known by trial counsel at the time of trial. *O'Neal*, 2010 Ark. 425, at 2, 2010 WL 4366898 (per curiam).

### E.   Jennifer Qualls

Howard's fifth contention is that the State withheld extensive impeachment evidence concerning Jennifer Qualls, a State witness who testified about Howard's comings and goings in the days surrounding the murders and who also stated that Howard told her he left his work boots in the U–Haul truck and someone was trying to frame him for the murders. The trial record shows that Howard did present impeachment evidence regarding Qualls at trial. The record further shows that Howard's counsel was aware of Qualls's extensive criminal record prior to trial.[5] Because this information was known at trial, it is not a proper *Brady* violation. *O'Neal*, 2010 Ark. 425, at 2, 2010 WL 4366898 (per curiam).

### F.   Philip Bush

Howard's penultimate guilt-phase contention is that the State failed to disclose material evidence that implicated Philip Bush in the murders. He maintains that on the morning of the murders, witnesses saw Bush leaving the scene at a high rate of speed, acting extremely suspiciously, and cleaning a handgun. Howard also alleges that after Caucasian hairs

---

4. During a hearing on pretrial motions, Howard's counsel said, "Brian Day, the victim in this case, was either arrested or shook down or confronted in some manner at his residence on Kaylee Drive by members of some law enforcement agency ... or very possibly a drug task force agency."

5. During the motion in limine hearing held on December 6, 1999, Howard's counsel said, "This jury needs to know who this young lady [Jennifer Qualls] is, what she's doing and what her motives are here.... [T]here's about 43 charges here ranging from disorderly conduct to attempting to influence a public servant."

were found on the work boots, Bush shaved his head, "for the first time in his life and has kept this unusual haircut ever since." He contends that evidence implicating Bush was known to members of the Little River County Sheriff's Department but was ignored because Bush was related to Sheriff Danny Russell.

Howard again fails to provide any support for his contention that this evidence was known to the State prior to trial and, as a result, this claim fails to meet the requirements for error coram nobis relief. *See Cloird,* 357 Ark. at 452, 182 S.W.3d at 480.

### |21G.  Shannon Day's Pregnancy

▮▮▮▮ Howard's final contention regarding the guilt phase of his trial is that the prosecution failed to disclose information concerning Granger's knowledge, or lack of knowledge, about Shannon Day's home-pregnancy test. Howard claims that Granger could not have seen a positive home-pregnancy test at the Days' home because "these tests have almost a 100 percent accuracy rate and because Shannon Day was not actually pregnant." The State correctly points out that during closing argument, Howard's counsel contended that Shannon Day was not pregnant.[6] Moreover, as this court said in *Howard III,* evidence of prosecutorial misconduct regarding Shannon Day's uncertain pregnancy could have been raised on direct appeal. *Howard III,* 367 Ark. at 27, 238 S.W.3d at 32. When an issue could have been raised at trial or is cognizable in some other legal proceeding, that issue is not cognizable in a later error coram nobis proceeding. *Gardner v. State,* 2011 Ark. 27, at 2, 2011 WL 291972 (per curiam).

### III.  Brady *Violation in Sentencing Phase*

▮▮▮▮ Howard's final argument is that the prosecution failed to disclose mitigating evidence which would have materially affected the sentencing phase of his trial. He claims that the State failed to disclose a Little River County Sheriff's Office report (report) detailing abuse that he suffered at the hands of his stepfather, Bruce Howard. According to Howard, when he was seventeen years old, he went to the Little River County Sheriff's Office and reported |22that his stepfather had beaten him several days earlier. He reported, in addition, that his stepfather pulled out a gun and said he was going to "rip his head off" with it. Howard claims that the State's failure to disclose this report violates *Brady* because it constitutes material evidence concerning his punishment. Howard asserts that he did not learn of the existence of the sheriff's report until November 2006, when the circuit court ordered release of his Juvenile and Social Services file. He further asserts that he has still not received a copy of the office report despite repeated requests. A copy of the report is not included with Howard's petition or the State's response. A copy of the Juvenile and Social Services file is attached to Howard's petition.

Howard cites three cases from the Supreme Court of the United States to support his contention that the State had a duty under *Brady* to disclose the sheriff's report that he previously filed against his father. In none of the three cases cited, however, did the defendant have personal knowledge about the nature of the withheld evidence prior to trial. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (Prosecution failed to

---

6. Howard's counsel argued as follows, "And don't you think the medical examiner would have testified that Shannon Day was pregnant when the autopsy was done? You didn't hear that."

disclose that a witness was a paid narcotics informant; this information was unknown to Bagley prior to trial.); *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972) (Prosecution failed to disclose misidentification of the defendant by several witnesses and failed to disclose inconsistent witness statements given before trial, all of which was unknown to Moore prior to trial.); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (The prosecutor failed to disclose an extrajudicial statement made by another defendant and which was discovered after the petitioner's conviction was affirmed.).

Under *Brady*, the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to *guilt or to punishment*, irrespective of the good faith or bad faith of the prosecution. *Brady*, 373 U.S. at 87, 83 S.Ct. 1194 (emphasis added). The Court has been clear that in evaluating the materiality of suppressed evidence under *Brady*, courts must distinguish between the materiality of the evidence with respect to guilt and the materiality of the evidence with respect to punishment. *Cone v. Bell*, 556 U.S. 449, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009). The suppression of mitigating evidence that is material to the jury's assessment of the proper punishment is a *Brady* violation, despite the fact that the same evidence might not be exculpating. *Id.* at 475, 129 S.Ct. 1769.

In *Cone*, Gary Cone contended that the State of Tennessee violated his right to due process by suppressing witness statements and police reports that would have corroborated his trial defense and bolstered his case in mitigation of the death penalty. *Id.* at 451, 129 S.Ct. 1769. Cone was sentenced to death after being convicted of several charges relating to a multistate crime spree, including two counts of first-degree murder. *Id.* at 453, 129 S.Ct. 1769. During his trial, Cone mounted an insanity defense and contended that he had killed two people while suffering from acute amphetamine psychosis caused by drug addiction. *Id.* at 451, 129 S.Ct. 1769. The prosecution repeatedly discredited that defense, calling Cone's drug addiction "baloney." *Id.*

As part of his postconviction process, Cone found evidence that the prosecutor had suppressed witness statements and police reports that supported his contention that he was a drug addict. Specifically, the prosecutor's files contained witness statements describing Cone as "wild eyed," or appearing to be "drunk or high," police reports describing his "frenzied manner," and police bulletins describing him as a "heavy drug user." *Id.* at 459, 129 S.Ct. 1769. Cone then amended his postconviction petition to include a *Brady* violation based on the evidence from the prosecutor's file. He alleged that the evidence was exculpatory to both the jury's determination of his guilt and its consideration of a proper sentence. *Id.* at 459–60, 129 S.Ct. 1769. After his postconviction petition was denied by the state courts, Cone filed a petition for writ of habeas corpus in federal district court based on the same claims.

After determining that the evidence was not material to his guilt, the Court determined that the evidence may well have been material to the jury's determination of the proper punishment. The Court, accordingly, remanded the case to federal district court with instructions to give full consideration to the merits of Cone's *Brady* claim. *Id.* at 476, 129 S.Ct. 1769.

Similarly, though known to Howard, his father's physical abuse was not made known to the jury; nor was the report from the sheriff's office. In the instant case, the sentencing forms listed several

mitigating factors for the jury to consider when assessing punishment. One of the factors listed on Form 2 was that "Timothy Howard lived in an abusive household as a youth." A review of the record shows that very little testimony was given regarding Howard's home life as a youth. Howard's aunt testified that there was abuse involving Bruce Howard and his wife, but she did not testify about any abuse to Howard by his stepfather. On the contrary, Howard's aunt testified that Howard's stepfather was "still a father to [Howard]."

The Juvenile and Social Services file that Howard has attached to his petition shows that on August 31, 1986, Howard reported to the Little River County Sheriff's Office that his stepfather had threatened to kill him. As a result, Howard was placed in an emergency shelter. The file also shows that Bruce Howard was convicted of murder in 1963 and served fifteen years in the penitentiary before being pardoned by the Governor. At the time the file was made, Bruce Howard was on bond for another murder charge. Extensive handwritten notes from a social worker assigned to Howard's case are attached to the file. In several places, these notes refer to the worker speaking with Little River County Sheriff's Office employees regarding Howard's case. The handwritten notes read, "Worker went to the sheriff's department and spoke with the dispatcher ... [who] showed worker the official report ... the official report stated that [Howard] came to the sheriff's office and stated that he was afraid to go home ... stated that Bruce Howard showed him a gun in his pick-up truck and threatened to 'rip his head off' with the gun."

The State contends that Howard's penalty-phase claim does not warrant granting his application for several reasons. The State initially contends that the evidence was within Howard's own peculiar knowledge before trial. Secondly, the State urges that Howard fails to show that there is a reasonable probability that the death sentence would not have been rendered had the jury been aware of Howard's allegedly abusive childhood. The State also contends that Howard has not diligently pursued this claim.

Evidence of childhood abuse can be considered as a mitigating circumstance. *See* Ark.Code Ann. § 5–4–602(4)(B)(ii) (Repl.2006) ("[M]itigating circumstance evidence shall be relevant to the issue of punishment, including, but not limited to, the nature and circumstances of the crime, and the defendant's character, background, history, and mental and physical condition as set forth in § 5–4–605."); *see also Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). In addition, the jury may consider in arriving at the appropriate sentence those mitigating and aggravating circumstances for which evidence, however slight, exists. *Williams v. State,* 347 Ark. 728, 754, 67 S.W.3d 548, 564 (2002).

Based on *Cone,* we also grant Howard's petition to reinvest jurisdiction in the circuit court to pursue a petition for writ of error coram nobis on the issue of the State's failure to disclose the Little River County sheriff's report concerning Howard's childhood abuse. We do so on the basis that the claim has apparent merit, which the circuit court should evaluate.

We acknowledge that Howard presents a unique set of circumstances where the report containing potentially mitigating evidence was in the possession of the same agency, the Little River County Sheriff's Office, that was investigating him for the murders of Brian and Shannon Day and the attempted murder of Trevor Day. When deciding whether to grant a petition

to reinvest jurisdiction in the circuit court to pursue a writ of error coram nobis, this court looks to the reasonableness of the allegations and the existence of the probability of the truth thereof. *Flanagan*, 2010 Ark. 140, at 1, 2010 WL 987049 (per curiam). Howard's allegation that the prosecution had access to the report because it was filed with the same law enforcement agency that was investigating the crimes appears, on its face, to be reasonable. In addition, the Juvenile and Social Services file adds weight to Howard's assertion that the report he alleges was withheld exists and that his allegations may have merit. This unique conflux of circumstances supports this court's decision to permit Howard to develop the facts surrounding this report further.

In deciding as we do, we recognize that defendants have a duty to make reasonable investigations into the circumstances surrounding their own cases, *see, e.g., Kemp v. State*, 348 Ark. 750, 758, 74 S.W.3d 224, 227 (2002), and we are in no way abandoning that rule by our decision today. We are, further, in no way holding that defendants are relieved of their duty to investigate relevant matters for purposes of mounting their defense, or that all state agencies have a duty to scour their records for potentially mitigating evidence in every case. In light of *Cone*, however, it is clear that a *Brady* violation can occur under certain circumstances with respect to mitigating evidence, even if that evidence is within the peculiar knowledge of a defendant. Thus, we grant Howard's petition to reinvest jurisdiction in the trial court to pursue a petition for writ of error coram nobis because the mitigating evidence at issue appears to have been within the knowledge of the same law enforcement agency that was investigating the crimes.

## IV. *Summary*

We conclude that there are two claims regarding the guilt phase that are appropriate for reinvesting the circuit court with jurisdiction. Both are based on alleged *Brady* violations that have apparent merit. The claims are the State's failure to disclose the DNA report with handwritten notes showing potential errors made by Bode during the DNA testing of the Negroid hairs and the State's failure to disclose a report from the Arkansas Crime Lab indicating that wood particles found on the work boots did not match the door of the Days' home. Accordingly, we reinvest jurisdiction in the circuit court to consider these two claims for purposes of error coram nobis relief, using the *Cloird* analysis:

(1) Whether the DNA test results or laboratory report were available to the State before trial;

(2) Whether either the DNA evidence or laboratory report, if available to the State before trial, was indeed favorable to the defense;

(3) Whether prejudice ensued to the defense as a result of the State's failure to disclose the DNA test results or laboratory report;

(4) Whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different; and

(5) Whether petitioner raised the possible *Brady* violations in a timely manner.

See *Cloird*, 349 Ark. at 39, 76 S.W.3d at 816 (per curiam).

We further grant the petition and reinvest the circuit court with jurisdiction to determine the merits of Howard's claim that mitigation evidence in the form of the sheriff's report was withheld from him prior to trial. The same *Cloird* analysis

would be appropriate for the circuit court's consideration of this claim.

Petition granted in part; denied in part.

Special Justice RONALD A. HOPE joins in this opinion.

CORBIN, J., not participating.