SLIP OPINION

Cite as 2016 Ark. 341

# SUPREME COURT OF ARKANSAS

No. CR-16-126

| | | |
|---|---|---|
| ADAM F. DOTY | | Opinion Delivered October 20, 2016 |
| | APPELLANT | |
| V. | | APPEAL FROM THE WHITE COUNTY CIRCUIT COURT, [NO. CR-2013-419] |
| STATE OF ARKANSAS | | HONORABLE ROBERT EDWARDS, |
| | APPELLEE | JUDGE |
| | | AFFIRMED. |

**PAUL E. DANIELSON, Associate Justice**

Appellant Adam F. Doty was convicted of first-degree battery in the White County Circuit Court and sentenced to ten years' imprisonment. The Arkansas Court of Appeals affirmed. *Doty v. State*, 2015 Ark. App. 193. Doty subsequently filed a petition for postconviction relief pursuant to Arkansas Rule of Criminal Procedure 37.1 (2015). The circuit court denied the petition after a hearing. Doty now appeals, arguing that his trial counsel was ineffective in three ways: (1) failing to obtain a recording of a 911 call that would have corroborated the testimony of a defense witness; (2) erroneously advising a defense witness to omit certain remarks from his testimony; and (3) failing to use available exhibits to discredit assertions of certain prosecution witnesses. We affirm the denial of postconviction relief.

Doty's first-degree-battery charge stemmed from a shooting that occurred on the evening of September 1, 2013. The victim, Justin Yandell, testified at trial that he, his father, and his brother heard gunfire close to their home and then heard shotgun pellets hitting their barn. Justin and his brother, Josh Yandell, approached their fence line to investigate, with Justin carrying a holstered pistol in the waistband of his shorts. At the fence line, they met Jesse Wood, who was with his young son collecting doves that had been shot. The Yandells had a conversation with Wood, who informed them that he was also with his father-in-law, George "Skip" Doty, and his brother-in-law, Adam Doty. The party was dove hunting on nearby property that they believed to be their family land. Justin recognized Skip Doty's name and decided to approach him to speak to him about the gunfire. According to Justin's trial testimony, he removed his pistol from his waistband and left it on the ground near the fence line before walking approximately eighty to one hundred yards to where the Dotys were. Wood followed behind him, and Josh Yandell returned home.

Justin testified that he found Skip and Adam Doty sitting in lawn chairs, holding shotguns. As he approached, he asked, "Are you Skip Doty?" At that point, Adam Doty came up behind Justin and hit him behind the right ear with the butt of his shotgun. Justin and Adam then fought over Adam's shotgun, with Justin eventually wrestling the gun away. As Justin staggered backward, holding the shotgun so that the barrel pointed toward the sky, Adam retrieved a pistol from his pocket and shot Justin in the knee. Justin testified that, as he begged for someone to call 911, the Dotys and Wood began packing up their equipment. Josh Yandell arrived minutes later, followed by their father, Jerry Yandell. According to the

Yandells' testimony, the Dotys and Wood held their guns in the Yandells' faces and made threats to all of them at various points.

Doty presented a justification defense. Wood testified that Justin did not leave his pistol at the fence line and that he carried it down to where he found the Dotys. Both Skip Doty and Adam Doty testified that they observed Justin reaching for something behind him as he approached, and Adam stated that he saw the pistol in Justin's waistband. According to Adam, Justin was very aggressive in his approach, and Adam believed that Justin would shoot either him or his father. Recordings of five 911 calls were introduced into evidence at trial: three from Josh Yandell, one from Skip Doty, and one from Wood's son.

Doty waived his right to a jury trial and was found guilty and sentenced by the court. He attempted to challenge the sufficiency of the evidence on appeal, arguing that the State failed to negate his claim of justification. *Doty*, 2015 Ark. App. 193. The court of appeals held that the argument was not preserved because Doty failed to renew his dismissal motion at the close of all the evidence. *See id.* The mandate issued on April 23, 2015.

On June 17, 2015, Doty filed the instant Rule 37 petition, which raised three issues. First, Doty argued that his trial counsel was ineffective for failing to obtain a previously undiscovered sixth 911 call. In this recording, county dispatch called Skip Doty back shortly after the altercation in order to ascertain where he and the other members of his party were. In short, Skip Doty informed dispatch that they were waiting on police and had not attempted to flee. This recording was apparently never handed over to the defense because

3

the State did not know of its existence.[1] Doty alleged that his trial counsel should have discussed with his father whether he made the 911 call so that a specific request could have been made for it. Second, Doty argued that his trial counsel was ineffective for erroneously advising his father not to testify that he should have shot or almost did shoot Justin Yandell himself. Doty contended that this advice was unreasonable and that it adversely affected his father's credibility. Third, Doty argued that his trial counsel was ineffective for failing to introduce photographs and ballistics information[2] that purportedly would have called into question the Yandells' assertion that their property was being pelted by gunfire. Doty maintained that this evidence would have discredited the entire premise on which the incident allegedly started.

After a hearing, the circuit court entered its order denying Doty's Rule 37 petition on October 28, 2015. The court found that Doty's trial counsel had given him and his father an opportunity to listen to the five 911 calls provided in discovery and that, in any event, Doty was not prejudiced by the absence of the sixth recording, which could have been used to impeach Skip Doty based on inconsistencies with his testimony. The court further found that trial counsel's advice regarding Skip Doty's testimony was reasonable trial strategy and that

---

[1]This recording was discovered while Doty's appeal was pending. Doty's trial counsel, who also represented him on appeal, filed a petition for writ of error coram nobis, asking this court to reinvest jurisdiction in the circuit court for purposes of discovering this additional evidence. This court denied the petition.

[2]The petition referred to both photographs and ballistics reports, but only the photographs were introduced at the Rule 37 hearing.

the photographs established nothing other than the crime-scene location. Doty filed a timely notice of appeal.

This court does not reverse a denial of postconviction relief unless the circuit court's findings are clearly erroneous. *See, e.g.*, *Taylor v. State*, 2015 Ark. 339, 470 S.W.3d 271. A finding is clearly erroneous when, although there is evidence to support it, the appellate court, after reviewing the entire evidence, is left with the definite and firm conviction that a mistake has been made. *See id.* In making a determination on a claim of ineffective assistance of counsel, this court considers the totality of the evidence. *See id.*

On review of claims of ineffective assistance of counsel, this court follows the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See id.* Under that two-prong analysis, to prevail on a claim of ineffective assistance of counsel, the petitioner must show that (1) counsel's performance was deficient and (2) the deficient performance prejudiced his defense. *See id.* The benchmark for judging a claim of ineffective assistance of counsel must be "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Sherman v. State*, 2014 Ark. 474, at 2, 448 S.W.3d 704, 708 (per curiam) (quoting *Strickland*, 466 U.S. at 686).

To satisfy the first prong of the *Strickland* test, the petitioner must show that counsel's performance was deficient. *See, e.g.*, *Taylor*, 2015 Ark. 339, 470 S.W.3d 271. To meet this requirement, a postconviction petitioner must show that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the petitioner by the Sixth Amendment to the United States Constitution. *See id.* There is a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance, and a petitioner has the burden of overcoming this presumption by identifying specific acts or omissions of counsel, which, when viewed from counsel's perspective, could not have been the result of reasonable professional judgment. *See id.*

In order to meet the second prong of the test, a claimant must show that there is a reasonable probability that the fact-finder's decision would have been different absent counsel's errors. *See id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. *See id.* The language, "the outcome of the trial," refers not only to the finding of guilt or innocence but also to possible prejudice in the sentencing. *See id.* at 5, 470 S.W.3d at 275 (citing *Howard v. State*, 367 Ark. 18, 238 S.W.3d 24 (2006)).[3]

Unless a petitioner under Rule 37 makes both required showings under the *Strickland* analysis, it cannot be said that the conviction resulted from a breakdown in the adversarial process that renders the result unreliable. *See, e.g.*, *Anderson v. State*, 2015 Ark. 18, 454 S.W.3d 212 (per curiam). There is, therefore, no reason for a court deciding an ineffective-

---

[3]Doty argues on appeal that the circuit court misstated the burden of proof on the prejudice prong. In its order, the court concluded that the absence of the sixth 911 call "did not and would not lead to different finding by the Court with respect to the defendant's guilt"; that Skip Doty's testimony regarding his intention to shoot "would have had no favorable impact on the defendant's case and would not have caused the court to make a finding of innocence"; and that the unused photographs "would have had no impact on a finding of guilt made by the trial Court had they been so introduced." Doty points out that our law requires only a reasonable probability that the outcome would have been different. However, it is clear to this court that the circuit court's phrasing merely reflects the fact that the same judge presided over both the trial and the Rule 37 proceeding.

assistance claim to address both components of the inquiry if the petitioner fails to make a sufficient showing on one. *See id*.

I. *Failure to Obtain Missing 911 Call*

For his first point on appeal, Doty contends that his trial counsel provided ineffective assistance by failing to obtain the previously undisclosed sixth 911 call. As Doty points out, his father was cross-examined at trial regarding his conversation with dispatch following the altercation:

PROSECUTOR: [W]hy didn't wait there for the police to get there?

SKIP DOTY: We did.

PROSECUTOR: Not at the scene of the shooting.

SKIP DOTY: Because the people there that wanted to do us harm were right there. We left to where they were and went to the truck and I—and I unloaded all of our weapons and I talked to the 911 and she said, seems to me like the story—she said where are you? And I said we're standing here at the end of our lane. And they—you know, they're not coming down here. And she said, well they're—she said I thought that—

. . . .

SKIP DOTY (CONTINUING): She said that's not—that's not the story that I'm hearing. She said I'm—she said that they're saying that you all have guns and you're going to go to war with the police. I said, no, ma'am. I said we're—we're right here and I'll just walk down there to them if you'll let them know that nobody's here to do anybody harm. We—we've been attacked and we just defended ourselves and we're just trying to—to wait for y'all to get here so we can tell you what happened.

PROSECUTOR: I didn't hear that on the 911 tape. You didn't say—

SKIP DOTY: Well, that's what I said.

PROSECUTOR: No, sir, you didn't.

7

At the time of this testimony, the prosecutor was unaware of the existence and the content of the missing recording, wherein county dispatch called Skip Doty back in order to ascertain his whereabouts following the altercation. That recording would have corroborated Skip Doty's testimony in some respects:

DISPATCH: Okay. We need to get—the police are looking for y'all. Okay.

SKIP DOTY: Their—their cars are at the end of the driveway that we're on. We're sitting here looking at them.

DISPATCH: Okay. What—

SKIP DOTY: They got on a four-wheeler or something and—

DISPATCH: They had to go out there and get him because he was bleeding to death.

SKIP DOTY: That's—no, he wasn't bleeding to death, but anyway, that's—that's where they went.

DISPATCH: Okay.

SKIP DOTY: We're—we're right here on this driveway that—

DISPATCH: What driveway are you at? Tell me what driveway.

SKIP DOTY: Tom Ed Reeves' driveway. That's where their cars—I can see their cars—

DISPATCH: Can you go down—can you go down there to them?

SKIP DOTY: Yeah. Yeah, they—

DISPATCH: What kind of vehicle are you going to be in?

SKIP DOTY: We're in a white pickup, but I can walk right there, I mean—

DISPATCH: You can walk to him? You are standing at the end of a driveway?

SKIP DOTY:  Yeah, I can see their cars right now.

DISPATCH:  You can see their cars?

SKIP DOTY:  Yeah.  I—nobody's running here, it's just—

DISPATCH:  Okay, well—

SKIP DOTY:  —nobody's afraid's of getting in trouble or anything.

DISPATCH:  Okay.  Well, just—

SKIP DOTY:  That isn't right.

DISPATCH:  Okay.  Well, yeah—what we're getting is a different story, and so, we just want—we want your side of the story.  That's what we're wanting.

SKIP DOTY:  That's—that's what I was wanting—that's why I was wondering why they're not coming on to me.

DISPATCH:  Well, we're trying—we're trying to find an address of where y'all were at.

SKIP DOTY:  Oh, we're right here.

DISPATCH:  Okay.

SKIP DOTY:  We're waiting on y'all to get here.

DISPATCH:  Okay.  You're standing there—

SKIP DOTY:  Nobody's—

DISPATCH:  You're standing—

SKIP DOTY:  —running from anything.

Doty contends that his trial counsel should have discussed this undisclosed 911 call with his father and Wood, who was also briefly heard on the recording, so that trial counsel

would have been made aware of its existence and could have made a specific request for it. Doty further argues that his defense was prejudiced by the absence of the sixth 911 call because his father was impeached on that basis. Doty points out that his father's testimony corroborated his own and supported his theory of justification.

The obvious problem with Doty's argument is that trial counsel would have had no way of knowing that there was a sixth 911 call to discuss or request, as it was not provided to him. He simply did not know of its existence. Thus, what Doty suggests his trial counsel should have done was, in fact, impossible. Doty also maintains that his trial counsel's performance was deficient because he failed to go over with "crucial witnesses" the five 911 calls that were provided in discovery—the implication being that Skip Doty or Jesse Wood would have noticed that one 911 call was missing. We disagree. Trial counsel testified at the Rule 37 hearing that he had listened to the recordings himself in preparation for trial, that he had spoken with the Dotys numerous times about their participation in the 911 calls, and that he believed he had provided the recordings to the Dotys so that they could listen to them. While he could not remember whether the Dotys had actually listened to the recordings prior to trial, trial counsel was unequivocal in stating that his general practice is to make all discovery, including recordings, available to his clients. As the State points out, there is simply no authority that required trial counsel to actually sit down with his client's family and listen to the 911 calls together. Doty has failed to overcome the strong presumption that his attorney's conduct fell within the wide range of reasonable professional assistance. *See, e.g.*, *Taylor*, 2015 Ark. 339, 470 S.W.3d 271. Because Doty has failed to satisfy the deficient-

SLIP OPINION

performance prong of the *Strickland* test, there is no need to address the prejudice component. *See, e.g.*, *Anderson*, 2015 Ark. 18, 454 S.W.3d 212.

## II. *Advice Concerning Skip Doty's Testimony*

For his second point on appeal, Doty contends that his trial counsel was ineffective in advising Doty's father to omit from his trial testimony any statement indicating that he should have shot or was about to shoot Justin Yandell himself. Doty argues that this amounted to deficient performance because the advice was inherently unreasonable. More specifically, he maintains that because the defense being presented was justification, it would have been not only appropriate but also necessary for Skip Doty to testify that he too would have used deadly physical force. Doty further argues that the absence of this testimony prejudiced his defense, as evidenced by the following remark made by the trial court in announcing its finding of guilt: "[I]f there was a true situation that justified deadly physical force, why didn't [Skip Doty] use it?"

Doty's argument is without merit. This court has consistently held that, when a decision by trial counsel is a matter of trial tactics or strategy and that decision is supported by reasonable professional judgment, then such a decision is not a proper basis for relief under Rule 37. *See, e.g.*, *Decay v. State*, 2014 Ark. 387, 441 S.W.3d 899 (citing *Mason v. State*, 2013 Ark. 492, 430 S.W.3d 759). This is true even where the chosen strategy was improvident in retrospect. *See id.* (citing *Sartin v. State*, 2012 Ark. 155, 400 S.W.3d 694; *Flowers v. State*, 2010 Ark. 364, 370 S.W.3d 228 (per curiam)). Doty's trial counsel testified at the Rule 37 hearing that his advice to Skip Doty was part of his trial strategy. Specifically, he stated that

Skip Doty had a "very strong personality" and described him as assertive, overbearing, and "very angry about this whole episode." For that reason, trial counsel explained, he advised Skip Doty that "unless that was his response to a particular question," he should not volunteer testimony indicating that he would have shot the victim himself. Clearly, trial counsel feared that such remarks would make Skip Doty appear to have been the aggressor, which would undercut the defense's theory that Justin Yandell was the aggressor and that Doty was justified in shooting him. Trial counsel's advice to Skip Doty that he avoid such remarks was obviously a trial strategy supported by reasonable professional judgment. Again, because we hold that Doty has failed to establish deficient performance on the part of his trial counsel, we need not decide whether he has established prejudice. *See, e.g.*, *Anderson*, 2015 Ark. 18, 454 S.W.3d 212.

### III. *Failure to Introduce Photographs*

For his third point on appeal, Doty maintains that his trial counsel was ineffective for failing to introduce photographs purporting to show that the Yandells could not have been telling the truth when they asserted that the Dotys' gunfire had been hitting structures on their property. To support his claim that prejudice resulted, Doty asserts that any document that would have impeached the Yandells was relevant to the defense and should have been used.

As set forth above, when a decision by trial counsel is a matter of trial tactics or strategy and that decision is supported by reasonable professional judgment, then such a decision is not a proper basis for Rule 37 relief. *See, e.g.*, *Decay*, 2014 Ark. 387, 441 S.W.3d 899. Doty's

trial counsel testified at the Rule 37 hearing that the decision not to use the photographs at issue, which were provided to him by Skip Doty, was a tactical one. He explained that he had thoroughly studied the photographs and that he had also spent time at the crime scene. He further explained that the photographs were actually intended to be used in conjunction with the testimony of Barry Reynolds, a prosecution witness. Reynolds was apparently an eyewitness, and the photographs were meant to show "the distance Mr. Reynolds' home was from the scene where the shooting took place."[4] Trial counsel stated that the primary purpose of the photographs was to impeach Reynolds and that, when Reynolds was ultimately not called to testify, trial counsel "didn't see the point of introducing those pictures." Moreover, as the circuit court found, the photographs did not establish where the gunfire originated. They only demonstrated where the altercation took place. For these reasons, trial counsel's decision not to use the photographs cannot be described as unreasonable, and there is no need to address the prejudice prong of the *Strickland* inquiry. *See, e.g.*, *Anderson*, 2015 Ark. 18, 454 S.W.3d 212.

For the above-stated reasons, and considering the totality of the evidence, we hold that the circuit court did not clearly err in denying Doty's petition for postconviction relief. In short, we cannot say that his trial counsel's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Sherman*, 2014 Ark. 474, at 2, 448 S.W.3d at 708 (quoting *Strickland*, 466 U.S. at 686).

---

[4]The photographs are marked with notations such as "BR front Porch" and "Where BR claimed to be standing."

Affirmed.

HART, J., concurs.

**JOPSEPHINE LINKER HART, Justice, concurring.** Given this court's Rule 37 jurisprudence, this case is affirmable. I write separately to emphasize two issues raised by this case, but not addressed directly. One issue is the problem with applying the *Strickland* standard to bench trials, and the other is how to characterize the 911 calls that were not turned over by the State.

First, because this case was tried to the bench, the judge was both the fact-finder and, for lack of a better term, the referee. In the latter role, a judge is charged with ensuring that Mr. Doty received a fair trial. Accordingly, in a Rule 37 proceeding, the trial judge is at least indirectly on trial as well as the trial counsel. When the trial judge finds that the asserted grounds for finding ineffective assistance of counsel would not have affected the outcome of the trial, logically speaking, it is both a finding of fact and uncontradicted direct evidence of how the finder of fact would have viewed the trial counsel's performance. Without getting into the issue of whether the trial judge was actually biased, I submit that it at least has the appearance of impropriety when the trial judge is effectively giving himself his own report card. Even when a jury is the finder of fact, the trial judge, in presiding over a subsequent Rule 37 proceeding, is still deciding the question of whether a Rule 37 petitioner received a fair trial. In the process, the trial judge is, at least in part, assessing his or her own performance. In my view, this court should consider assigning Rule 37 cases to a judge who did not preside over the trial.

The second issue is one unique to this case. Mr. Doty's Rule 37 counsel alleges ineffective assistance of counsel for the trial counsel's failure to discover the additional 911 tapes that were not played at trial. In my view, the failure by the State to turn over the tapes was a clear *Brady* violation. *See Brady v. Maryland*, 373 U.S. 83 (1963). In the post-conviction context in Arkansas, *Brady* violations may be addressed by seeking a writ of error coram nobis, *see Howard v. State*, 2012 Ark. 177, 403 S.W.3d 38, but they cannot support a Rule 37 petition. *Id*. Unfortunately, in the case before us, Mr. Doty petitioned for a writ of error coram nobis before his direct appeal had been decided. Because the petition for the writ was filed prematurely, it was summarily dismissed by docket entry and could at least arguably be available as a potential means of securing postconviction relief.

*Jeff Rosenzweig*, for appellant.

*Leslie Rutledge*, Att'y Gen., by: *Valerie Glover Fortner*, Ass't Att'y Gen., for appellee.