Josephine Linker Hart, Justice, concurring. I agree with the majority that this case was properly remanded to the circuit court inasmuch as its actions upon prior remand were completely indistinguishable from the actions that once again placed this case before us. I write separately because it is time for this court to dispose of “due-diligence” associated with our error coram nobis jurisprudence. First consider the black-letter law regarding error coram nobis in Arkansas. We have so often said the following it is axiomatic: error coram nobis proceedings are attended by a strong presumption that the judgment of conviction is valid. See, e.g., Howard v. State, 2012 Ark. 177, 403 S.W.3d 38. The Howard court set out the boilerplate that appears regularly in our decision denying relief. A writ of error coram nobis is an extraordinarily rare remedy, more known for its denial than its approval. For the writ to issue following the affirmance of a | ^conviction and sentence, the petitioner must show a fundamental error of fact extrinsic to the record. The function of the writ is to secure relief from a judgment rendered while there existed some fact which would have prevented its rendition if it had been known to the trial court and which, through no negligence or fault of the defendant, was not brought forward before rendition of judgment. The writ is issued only under compelling circumstances to achieve justice and to address errors of the most fundamental nature. We have held that a writ of error coram nobis is available to address certain errors that are found in one of four categories: (1) insanity at the time of trial, (2) a coerced guilty plea, (3) material evidence withheld by the prosecutor, or (4) a third-party confession to the crime during the time between conviction and appeal. Id. at 4, 403 S.W.3d at 42-43 (internal citations omitted). Further, the Howard court noted that [t]his court will grant permission for a petitioner to proceed in the trial court with a petition for writ of error coram nobis only when it appears the proposed attack on the judgment is meritorious. In making such a determination, we look to the reasonableness of the allegations of the petition and to the existence of the probability of the truth thereof. Id. at 5, 403 S.W.3d at 43 (quoting Flanagan v. State, 2010 Ark. 140, at 1, 2010 WL 987049 (per curiam)). Adding a requirement that the petitioner act with “due diligence” to this already dauntingly difficult burden is contrary to purpose of the writ. It should not be a stumbling block to error coram nobis relief when the writ is only issued to achieve justice when there has been a fundamental and manifest injustice. Furthermore, the concept of “due diligence” is completely devoid of any objective standard. We need only consider the companion cases of Strawhacker v. State, 2016 Ark. 348, 500 S.W.3d 716, and Pitts v. State, 2016 Ark. 345, 501 S.W.3d 803. In those cases, we reinvested jurisdiction in the trial court to consider the effect of repudiated trial testimony of FBI lab technician Michael Malone, a forensic hair analyst. Pitts had been incarcerated since 1981 and Strawhacker since 1990. Both men were notified that the Department of Justice (DOJ) had repudiated Malone’s testimony in 2014. However, the substance of the 17PO J letter was that Malone’s testimony was infirm because he had offered an expert opinion that exceeded the bounds of the science he practiced—microscopic hair analysis. However, it was apparent that Malone’s testimony was infirm for that reason the very day that he gave it.[1] Moreover, neither Pitts’s nor Stra-whacker’s action upon receipt of the DOJ notification that it was repudiating Malone’s testimony was exactly instantaneous. In short, when this court has seen a case in which there has been an apparent, manifest denial of justice, “due diligence” is never an issue. The people of the State of Arkansas gain nothing by unjustly imprisoning one of its fellow citizens. , The DOJ and the FBI review concluded that there were three types of errors in Malone's testimony: (1) [T]he examiner stated or implied that the evidentiary hair could be associated with a specific individual to the exclusion of all others—this type of testimony exceeded the limits of the science; (2) the examiner assigned to the positive association a statistical weight or probability or provided a likelihood that the questioned hair originated from a particular source, or an opinion as to the likelihood or rareness of the positive association that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association—this type of testimony exceeded the limits of the science; or (3)the examiner cites the number of cases or hair analyses worked in the laboratory and the number of samples from different individuals that could not be distinguished from one another as a predictive value to bolster the conclusion that a hair belongs to a specific individual—this type of testimony exceeded the limits of the science. Pitts, supra.