SLIP OPINION

Cite as 2015 Ark. 225

# SUPREME COURT OF ARKANSAS

No. CR-02-213

| | | |
|---|---|---|
| | | **Opinion Delivered** May 21, 2015 |
| KENNETH ISOM | | PETITION TO REINVEST |
| | APPELLANT | JURISDICTION IN THE CIRCUIT |
| | | COURT TO CONSIDER A |
| | | PETITION FOR WRIT OF ERROR |
| V. | | CORAM NOBIS |
| | | [DREW COUNTY CIRCUIT |
| | | COURT, NO. 22CR-01-52] |
| STATE OF ARKANSAS | | |
| | APPELLEE | PETITION GRANTED. |

**JOSEPHINE LINKER HART, Associate Justice**

A jury found Kenneth Isom guilty of capital murder, aggravated robbery, residential burglary, attempted capital murder, and two counts of rape and sentenced him, respectively, to sentences of death, life imprisonment, 40 years' imprisonment, 60 years' imprisonment, and life on each count of rape, with the sentences to be served consecutively. This court affirmed his convictions and sentences. *Isom v. State*, 356 Ark. 156, 148 S.W.3d 257 (2004). Isom further sought postconviction relief under Arkansas Rule of Criminal Procedure 37.5, and this court affirmed the circuit court's denial of his petition. *Isom v. State*, 2010 Ark. 495, 370 S.W.3d 491. Isom now petitions this court to reinvest jurisdiction in the trial court to consider a petition for writ of error coram nobis. We grant his petition to reinvest jurisdiction.

The proper standard of review for granting permission to reinvest jurisdiction in the circuit court to pursue a writ of error coram nobis is whether it appears that the proposed

attack on the judgment is meritorious. *Howard v. State*, 2012 Ark. 177, at 4–5, 403 S.W.3d 38, 43. In making such a determination, we look to the reasonableness of the allegations of the petition and to the existence of the probability of the truth thereof. *Id*., 403 S.W.3d at 43. A writ of error coram nobis is available to address certain fundamental errors extrinsic to the record, such as material evidence withheld by the prosecutor. *Id*. at 4, 403 S.W.3d at 42–43. To establish a violation of *Brady v. Maryland*, 373 U.S. 83 (1963) by the State's withholding of evidence, the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the State, either willfully or inadvertently; prejudice must have ensued. *Id*. at 8, 403 S.W.3d at 44.

Isom was convicted of killing Bill Burton and attempting to kill Dorothy Lawson, and of committing two counts of rape against Lawson, aggravated robbery, and residential burglary, based on an incident at Burton's trailer on April 2, 2001. Lawson, who was 72, was at Burton's home with Burton, who was 79. Burton had recently had hip surgery, and Lawson was there to care for him. Lawson testified that she opened the door that evening to a man she had seen next door earlier that day. Lawson identified Isom as the man who pushed passed her and demanded money from Burton. Burton gave him some money, but Isom was not satisfied and pulled a pair of broken scissors from his pocket. Lawson testified that Isom had her remove her clothes, raped her vaginally and anally and forced her to perform oral sex on him. Lawson testified that he forced her into a closet and that when she looked out she saw Isom standing on Burton's head. Lawson fought with Isom in an attempt to prevent him from hurting Burton, and she cut her hand on the scissors in the process. Lawson was knocked unconscious,

choked, and she eventually passed out. A neighbor found her the next morning, bleeding, partially paralyzed, and crying for help.

At the hospital, the doctor performing the rape-kit examination found a hair in Lawson's vaginal opening. Analysis of that hair excluded Lawson or Burton as DNA contributors. The analysis also determined that a DNA sample from Isom had bands that were not inconsistent with those in the hair's DNA. The original analysis determined the likelihood of finding another person with the same consistent DNA bands was 1 in 57,000,000 in the African–American population. The additional testing conducted postconviction established the likelihood of finding another person with the same consistent DNA bands was 1 in 580,000 for a nonrelative. On April 5, 2001, an officer visited with Lawson in the hospital to see if she could identify her assailant from a photographic lineup. After first focusing on photographs one and three, she selected photo three, which was Mr. Isom.

In addition to Lawson's testimony at trial, Ken Ouellette testified that he drove by the Burton residence at about 7:00 p.m. on April 2, 2001. He saw Lawson and a gentleman he later identified as Isom talking in front of the house next door to Burton's. Linda Kay Johnson, who lived across the street, testified that she knew Isom, had seen him at the house next door to Burton's on previous occasions, and had seen him talking to Lawson some time before 7:00 p.m. on April 2, 2001.

In his petition and an attached proposed petition for filing in the trial court, Isom sets out a number of proposed grounds for the writ based on various claims that the prosecution withheld evidence. The grounds proposed are as follows: (1) the State suppressed evidence that

Lawson did not identify Isom as her attacker in a photo array shown to her on April 4, 2001; (2) the State suppressed evidence that Lawson failed to identify Isom in a photo array shown to her on April 5, 2001; (3) the State suppressed Rick McKelvey's investigative notes about the interviews of Lawson while she was in the hospital; (4) the prosecution failed to correct false testimony when Lawson testified that she was not on pain medication while in the hospital and that she did not attempt to make an identification without her glasses; (5) the State suppressed evidence that Ouellette was aware that Isom was the main suspect before identifying him; (6) the State suppressed evidence that Ouellette had a motive to curry favor with the police department; (7) the State suppressed evidence concerning the DNA evidence by turning over illegible copies of documents and incomplete copies of the gel strips or DNA ladders; (8) the State suppressed evidence of alternative suspects.

We focus on Isom's last claim, which is that the State withheld evidence that might have led counsel to utilize a defense based on an alternate suspect. Prior to trial, Isom's attorneys had notified the prosecution that they planned to call as witnesses a number of the prosecutors involved in the case, and, as a result, there was a pretrial hearing on a motion to quash the subpoenas. Deputy Prosecutor Frank Spain testified during that hearing concerning potential evidence from Kevin Green. The defense was aware of some letters written by inmates who claimed that, while he was incarcerated, Green had said that he smoked crack with Jerry Avery and that Avery had told Green that he committed the Burton murder. Green, according to the inmates' letters, intended to use the information from Avery to strike a deal with the prosecution so that he could be released on his own recognizance. Spain was

questioned about whether he was involved with a search conducted by the detectives investigating Burton's murder as a result of information from Green.

Spain's testimony at the pretrial hearing was that he was told by Green's attorney and some of the officers working the case that Green had information about the weapon in Burton's murder and that Green wanted to be released from jail. Spain agreed to the deal, and he went to a house where the weapon was supposed to be. According to Spain's testimony at the hearing on the motion to quash, they looked for the weapon and "[n]o item was found." The motion to quash was granted, and no defense was developed at trial using Green or Avery as an alternate suspect.

At Isom's Rule 37.5 hearing, Spain was sworn, and he reaffirmed an unsworn account under oath. In it, he stated that one of the police officers had come to him because Green had approached them with information similar to what had been in the inmate letters. Green wanted to be released on his own recognizance before he would give the information, and Spain testified that he would not give Green what he wanted until they had the information and it proved to be useful. Spain stated that they went to the place where Green said that the evidence could be collected and that the officers searched the trailer home located there. Green said he believed that a pair of scissors was recovered, that he looked at whatever it was that had been recovered, and released Green. Spain also said that the scissors were sent to the crime lab for testing, but did not produce anything to connect them to the crime.

Thus, Spain's testimony during the pretrial hearing was at odds with his testimony in the Rule 37.5 hearing. Given that Spain, under oath, has testified to two different versions of

the facts, we are compelled to have the circuit court conduct an evidentiary hearing, as we are not in the position to exalt one version over the other. If Isom is correct, and Spain's testimony at the Rule 37 hearing was the accurate one, then there was clearly a fundamental error of fact extrinsic to the record that prevented Isom from presenting Spain as a witness and developing his alternative theory that Avery, not Isom, committed the murder. In addition, if Spain's new version of the facts is correct, then there is a fundamental error of fact because there was an additional pair of scissors discovered on which DNA testing may or may not have been performed. We cannot ignore that there may be exculpable or impeaching evidence favorable to the accused that may have been willfully or inadvertently suppressed by the State, resulting in the circuit court quashing a subpoena to consider evidence related to other possible suspects.[1] Based on the foregoing, we grant Isom's petition to reinvest jurisdiction in the circuit court to seek a writ of error coram nobis on his claim of *Brady* violations. While Isom raises additional *Brady* claims that we could consider in this opinion, *see Howard*, 2012 Ark. 177, at 27–28, 403 S.W.3d at 54–55 (granting petition in part), we reinvest jurisdiction in the circuit court to consider these claims as well, *see Newman v. State*, 2009 Ark. 539, 354 S.W.3d 61 (reinvesting jurisdiction in the circuit court to consider several *Brady* claims raised by the petitioner). Further, when an error coram nobis claim has apparent merit, this court often leaves it to the circuit court to determine the factual issue of diligence. *Howard*, 2012 Ark 177, at 14, 403 S.W.3d at 47. Thus, we also leave to the circuit court consideration of whether Isom's petition was timely.

---

[1]We also note that Isom has asserted that he is related to Avery and has sought to test Avery's DNA. *Isom v. State*, 2010 Ark. 496, 372 S.W.3d 809.

Petition granted.

HANNAH, C.J., and DANIELSON and GOODSON, JJ., dissent.

**PAUL E. DANIELSON, JUSTICE, DISSENTING.** Because it does not appear to me that Isom's proposed attack on his judgment is meritorious, I would deny his petition to reinvest jurisdiction; therefore, I respectfully dissent.

While not apparent from the majority's decision today to grant Isom's petition to reinvest, our law is more than well settled that the writ of error coram nobis is an extraordinarily rare remedy, more known for its denial than its approval. *See Roberts v. State*, 2013 Ark. 56, 425 S.W.3d 771. Coram nobis proceedings are attended by a strong presumption that the judgment of conviction is valid. *See id.* The function of the writ is to secure relief from a judgment rendered while there existed some fact that would have prevented its rendition if it had been known to the circuit court and which, through no negligence or fault of the defendant, was not brought forward before rendition of judgment. *See Howard v. State*, 2012 Ark. 177, 403 S.W.3d 38.

The writ is allowed only under compelling circumstances to achieve justice and to address errors of the most fundamental nature. *See Newman v. State*, 2009 Ark. 539, 354 S.W.3d 61. We have held that a writ of error coram nobis is available to address only certain errors that are found in one of four categories: (1) insanity at the time of trial, (2) a coerced guilty plea, (3) material evidence withheld by the prosecutor, or (4) a third-party confession to the crime during the time between conviction and appeal. *See id.* Although there is no specific time limit for seeking a writ of error coram nobis, due diligence is required in making

an application for relief. *See id.* In the absence of a valid excuse for delay, the petition will be denied. *See id.* Due diligence requires that (1) the defendant be unaware of the fact at the time of trial; (2) the defendant could not have, in the exercise of due diligence, presented the fact at trial; and (3) the defendant, after discovering the fact, did not delay in bringing the petition. *See id.*

Where the writ is sought after the judgment has been affirmed on appeal, the circuit court may entertain the petition only after this court grants permission. *See Echols v. State*, 354 Ark. 414, 125 S.W.3d 153 (2003). This court will grant permission only when it appears the proposed attack on the judgment is meritorious. *See id.* In making such a determination, we look to the reasonableness of the allegations of the petition and to the existence of the probability of the truth thereof. *See id.*

Isom's petition to reinvest consists of several claims, each of which asserts that the prosecutor withheld material evidence under *Brady v. Maryland*, 373 U.S. 83 (1963). When examining allegations involving the withholding of material evidence in the context of a petition to reinvest jurisdiction to seek a writ of error coram nobis, this court has done so under *Brady*, which requires the State to disclose all favorable evidence material to the guilt or punishment of an individual. *See Newman*, 2009 Ark. 539, 354 S.W.3d 61; *see also Howard*, 2012 Ark. 177, 403 S.W.3d 38; *Cloird v. State*, 349 Ark. 33, 76 S.W.3d 813 (2002) (per curiam). With respect to *Brady* claims in this context, we have explained as follows:

> For a true *Brady* violation, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Evidence is material "if

there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Cook v. State*, 361 Ark. 91, 105, 204 S.W.3d 532, 540 (2005) (quoting *Strickler*, 527 U.S. at 280). The "reasonable probability" standard is applied "collectively, not item by item," such that the "cumulative effect" of the suppressed evidence, and not necessarily each piece separately, must be material. *Kyles v. Whitley*, 514 U.S. 419, 436–37 (1995). The rule set out in *Brady* also "encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Strickler*, 527 U.S. at 280–81 (quoting *Kyles*, 514 U.S. at 438). "In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'" *Strickler*, 527 U.S. at 281 (quoting *Kyles*, 514 U.S. at 437).

*Newman*, 2009 Ark. 539, at 13–14, 354 S.W.3d at 69.

Although the majority finds apparent merit in Isom's final claim that the State suppressed information that pointed to the guilt of others, I cannot agree. Isom claims that Kevin Green, an inmate at the Drew County jail, told prosecutors and law enforcement that he knew the whereabouts of scissors that were used to kill Mr. Burton, told other inmates that Isom was innocent of the murder, and told an inmate that another man, Jerry Avery, had confessed to the crimes. Isom asserts that Green was eventually taken from the jail to search a trailer in which a pair of scissors was found and was later released from jail upon recommendation of the prosecutor.

As further evidence of the State's suppression, Isom points to the statements of Frank Spain, a prosecutor. Isom avers that, prior to trial, he subpoenaed Spain to testify about the aforementioned search; but, the circuit court quashed the subpoena after Spain "testified falsely that no scissors had been recovered from the search led by Kevin Green." Isom then points to Spain's statements to the circuit court during Isom's postconviction hearing, in which Green denied receiving any consideration for information relating to the crimes. Isom maintains that

after Green testified, Spain went on the record to state that Green's testimony was false, in that Green had been released on his own recognizance after Spain and officers, acting on information from Green, searched a trailer home and recovered a pair of scissors, which were submitted to the crime lab for testing. Isom submits that the State has never disclosed any reports relating to Green's statements about the murder weapon or requests for interviews made by inmates in whom Green had confided.

Isom avers that, had Spain testified truthfully prior to Isom's trial, his subpoena would not have been quashed, and his trial counsel could have called Spain to testify regarding Green's knowledge of the crimes. He further opines that his counsel could have then pursued an investigation into the credibility of the inmates' statements and presented evidence to the jury of other suspects, such as Avery or even Green.

While Spain's actions in this matter are certainly disconcerting,[1] Isom's contentions

---

[1]Indeed, Spain's statements appear to be in conflict. At the hearing on the motion to quash, Spain testified that

a person by the name of Kevin Green who was represented by Gary Potts stated that he had some information regarding the, where he thought the murder weapon was. He asked for certain things in order to provide that information. He wanted to be released from jail, either pending his sentencing date, or pending bed space. I can't recall which of the two it was.

The officers working the case . . . came to me with this. I believe Mr. Potts, also, indicated to me that this person had this information.

I agreed to his wants. He had already stated that he would take a five year plea. So we went out to the house. We entered the house. And I believe I was the last person in the house. They looked for the item. No item was found and we left.

. . . .

[The search] didn't [reveal anything.]

He later testified at Isom's Rule 37 hearing, stating as follows:

The Court will recall when I asked a question [of Green during this hearing], the last question I believe I asked was about whether or not he had told anybody these statements or given any kind of statements about the Isom case to the police. I asked

falter in light of the fact that his trial counsel was clearly made aware of the other inmates'

alleged knowledge of Green's statements, as evidenced by the record. During his

postconviction hearing, Isom's trial counsel recalled and acknowledged receiving, prior to

Isom's trial, certain letters that "tended to implicate Mr. Green . . . purportedly knowing that

a Jerry Don Avery . . . had confessed to [killing Mr. Burton and assaulting Ms. Lawson]."

Trial counsel further stated that he attempted to speak with Green, but was unable to locate

---

that to clarify answers he'd given, and his answer was no.

Now, I feel compelled under my ethical duty to inform the Court that I believe that testimony was false. Now, whether or not he remembers incorrectly or gave a false statement, I can't say to the Court. But the events that are somewhat depicted in one of those letters were some truth in that Mr. Green was in court on the day he was OR'd. He apparently made contact with someone in the state police, either Scott Woodward or to John Dement. They approached me that day, stated that he had some information that he wanted to give, but wanted to be OR'd before he would give that information.

And my response to that was, well, I'm not going to OR anybody until I know what the information is going to be. So I think what we agreed to do was, is that he would tell them the information. We would check that information out. If it proved to be anything that could be useful, then we would agree to OR him.

It is my recollection that either at a lunch break or some other time that afternoon that day in court he gave some information about where some evidence might be collected. They got him in the car. Had him go in a car. It is true that I went with them to this location. . . . I don't know if we went in one car or two cars.

We went to a trailer house, Your Honor, or my recollection was a trailer house. The officers went in and searched the trailer house, and I believe recovered a pair of scissors from that house. We returned back. After they recovered whatever it was, I went and looked at whatever it was they recovered. Came back, and I believe he was OR'd.

. . . .

[Green] alleged [the information he had] to be related to this case, that these scissors could have been the scissors used in the commission of the offense. . . . When we go back and look at the file, the one documentation that I know that covers these files, these scissors were sent to the crime lab for testing. . . . And at that time the testing results showed no evidence of any sort, any relationship to that. I mean, there was no DNA, no nothing on them to that.

SLIP OPINION

him. He testified, however, that he neither attempted to find Avery, nor did he talk to the four inmates who had written the letters. It is clear that trial counsel was well aware of the existence of Kevin Green and the potential information that he might have possessed, and counsel could have made use of this information in defending Isom. Further, this court has already held that Isom did not "show a reasonable probability that but for counsel's failure to call Green as a witness at trial, the result would have been different." *Isom v. State*, 2010 Ark. 495, at 3, 370 S.W.3d 491, 494.

To the extent that information regarding any alleged scissors might have been suppressed by the State, the fact that Isom has alleged a *Brady* violation alone is not sufficient to provide a basis for error-coram-nobis relief. *See Camp v. State*, 2012 Ark. 226 (per curiam). Assuming that the alleged withheld evidence meets the requirements of a *Brady* violation and is both material and prejudicial in order to justify issuance of the writ, the withheld material evidence must also be such as to have prevented rendition of the judgment had it been known at the time of trial. *See id*. To merit relief, a petitioner must demonstrate that there is a reasonable probability that the judgment of conviction would not have been rendered, or would have been prevented, had the information been disclosed at trial. *See id*.

In order to carry his burden to show that the writ is warranted, Isom would have to demonstrate that, had the information been available that scissors containing no DNA were discovered following a tip by Green, the evidence would have been sufficient to have prevented rendition of the judgment.[2] *See, e.g.*, *Echols*, 354 Ark. 414, 125 S.W.3d 153. This

---

[2]The majority states that it is not in a position to exalt one version of Spain's testimony over the other; but, there is no need to even do so. Neither version renders Isom's proposed

he cannot do. As we outlined in Isom's direct appeal, there was an abundance of evidence to support his conviction for causing the death of Mr. Burton in the course of committing several felonies under circumstances manifesting extreme indifference to the value of human life:[3]

> Mrs. Lawson identified him as her attacker in the attempted murder and rapes and as the person who was physically abusing Mr. Burton. She further testified that Mr. Isom demanded and received money and her ring, using the threat of the broken scissors. Her testimony also is sufficient to support a burglary conviction in that she stated that he pushed his way into Mr. Burton's trailer home and proceeded to commit rape and aggravated robbery. And, finally, her in-court identification of Mr. Isom, as well as the body hair found in her vagina connecting him to the rape, placed him at the scene where Mr. Burton was murdered. While Mrs. Lawson did not specifically see Mr. Isom stab Mr. Burton with scissors or beat Mr. Burton with a lamp, she saw Mr. Isom with the scissors standing on Mr. Burton's head and then physically lying on top of him. She also heard his threats. She was then beaten, knocked unconscious, and choked by Mr. Isom. Mr. Burton's body was discovered the next morning, and his death was caused by multiple sharp and blunt force injuries. We conclude that there was more than sufficient evidence, direct and circumstantial, that Mr. Isom caused the death of Mr. Burton in the course of committing several felonies under circumstances manifesting extreme indifference to the value of human life.

*Isom*, 356 Ark. at 170–71, 148 S.W.3d at 267. In light thereof, it simply does not stand to reason that the existence of alleged scissors containing no DNA would have been sufficient to prevent rendition of the judgment. Without any showing of prejudice, Isom has failed to present a *Brady* claim having apparent merit.

This court is not required to accept the allegations in a petition for writ of error coram nobis at face value. *See Penn v. State*, 282 Ark. 571, 670 S.W.2d 426 (1984). Moreover, it is

---

attack meritorious. Regardless of whether the "evidence withheld" consists of no scissors having been found or scissors with no DNA having been found, that information, even if disclosed, simply cannot be said to have prevented the rendition of the judgment against Isom.

[3]Isom did not challenge on appeal the sufficiency of his convictions for aggravated robbery, residential burglary, rape, or attempted capital felony murder. *See Isom v. State*, 356 Ark. 156, 148 S.W.3d 257 (2004).

a petitioner's burden to show that the writ is warranted. *See Echols*, 354 Ark. 414, 125 S.W.3d 153. This court will not undertake to reinvest jurisdiction in the circuit court just for the purpose of allowing a petitioner to conduct some sort of fishing expedition. *See id.* Here, Isom has simply failed to show that, were we to reinvest, he could meet his burden to demonstrate that the writ is warranted; consequently, he has not shown that his proposed attack on the judgment appears meritorious.[4] Accordingly, I would deny Isom's petition to reinvest jurisdiction in the circuit court to consider a petition for writ of error coram nobis.

HANNAH, C.J., and GOODSON, J., join.

*Jenniffer Horan*, Federal Defender, by: *Julie Vandiver* and *Scott W. Braden*, Ass't Federal Defenders, for appellant.

*Dustin McDaniel*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for appellee.

---

[4]Nor do any of Isom's other claims for error–coram–nobis relief appear to have merit, which for the sake of brevity, I will not discuss here in detail. Suffice it to say that each of his claims fails because either (1) the record demonstrates that the information was known by Isom's trial counsel at the time of trial, or (2) the claim lacks factual substantiation. *See, e.g.*, *Burks v. State*, 2013 Ark. 188 (per curiam) (holding that a petitioner must factually substantiate a claim that information was actually withheld from trial counsel); *Howard*, 2012 Ark. 177, 403 S.W.3d 38 (holding that issues known at the time of trial and could have been addressed cannot serve as a basis for error–coram–nobis relief).