# United States Court of Appeals

### For the Eighth Circuit

_____

No. 15-3849

_____

Timothy Wayne Kemp

*Plaintiff - Appellant*

v.

Wendy Kelley, Director, Arkansas Department of Correction

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Pine Bluff

_____

Submitted: September 20, 2017
Filed: May 16, 2019

_____

Before WOLLMAN, MELLOY, and GRUENDER, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

Timothy Wayne Kemp was convicted of four counts of capital murder and sentenced to death on each count. The Supreme Court of Arkansas affirmed the convictions and sentences on direct review and subsequently affirmed the denial of his motion for postconviction relief. Kemp petitioned for a writ of habeas corpus in

federal district court under 28 U.S.C. § 2254. The district court[1] denied relief, but certified the following issue for appeal: whether trial counsel was constitutionally ineffective for failing to adequately investigate and present mitigating evidence related to Kemp's childhood abuse, fetal-alcohol exposure, and post-traumatic stress disorder. We affirm.

## I. Background

On October 4, 1993, Kemp spent the day drinking beer with his girlfriend, Becky Mahoney (Becky). They stopped to visit David Wayne Helton (Wayne), Robert Phegley (Sonny), and Cheryl Phegley (Cheryl) at Wayne's trailer, where all of them drank more beer and danced as Sonny played the guitar. Also present was a man named Richard Falls (Bubba). As will be seen, Wayne, Sonny, Cheryl, and Bubba were soon to lie dead, victims of Kemp's anger-fueled fusillade.

Kemp became angry with Becky, and she refused to leave the party with him. Cheryl intervened, asking Kemp to leave two or three times before he complied. Becky testified that as he left, Kemp threatened that she would be sorry for not leaving with him. "Becky became upset and planned to have Cheryl take her home because she was afraid [Kemp] would return, and she didn't want any trouble." Kemp v. State, 919 S.W.2d 943, 946 (Ark. 1996) (Kemp I).

Kemp either drove around the neighborhood or back to his mother's house, where he and Becky lived. He returned to the trailer with his .22 caliber rifle and knocked on the door. When the door opened, Kemp shot Wayne and kept shooting. When Becky heard the shots being fired and saw two victims fall, she ran to the bedroom and hid in a closet. As Becky later testified, "The gun was going off. It just

---

[1]The Honorable D.P. Marshall, Jr., United States District Judge for the Eastern District of Arkansas.

kept going off." Becky left the closet after the gunfire had ceased and found the victims' bodies on the floor of the living room. She dialed 911 and thereafter heard the distinctive sound of Kemp's truck starting up. Becky testified that although she and Kemp each had consumed approximately one case of beer that day, "she did not consider [Kemp] 'drunk,' as it was not unusual for him to drink a lot of beer in the course of a day." Id.

Kemp drove to his friend Bill Stuckey's residence and confessed to killing Wayne, Sonny, Cheryl, and Bubba, whom he did not know. Kemp told Stuckey that after "they ran him off and kept Becky there," he went home, retrieved his rifle, and returned to the trailer. Kemp said that Wayne hit the ground "[l]ike a sack of taters" and that Bubba was "just in the wrong place at the wrong time." According to Kemp, Cheryl had "started all the argument," so when she crawled down the hallway trying to get away from Kemp and saying "that she was afraid she was going to die," Kemp "assured her that, yes, she was going to die" and then shot her. Stuckey recognized that Kemp had been drinking, but he had no trouble understanding Kemp and testified that Kemp was not "knee-wobbling" drunk.

Upon arriving at the scene in response to Becky's 911 call, law enforcement officers found the bodies of the four victims and twelve spent .22 caliber shell casings. Officers soon located Kemp and arrested him without incident. After being advised of his Miranda rights, Kemp told an officer that "these people beat his ass and threatened him and he was just defending himself." Id. Officers found a .22 Ruger semi-automatic rifle during a search of Kemp's mother's home. A box of .22 Remington shells was found on the front seat of Kemp's truck.

Kemp escaped from county jail shortly after his arrest. He was apprehended one month later in Texas. In February 1994, Kemp was charged with four counts of capital murder. Attorney Jeffrey Rosenzweig was appointed to represent him. The court granted Rosenzweig's motion for the appointment of Judy Rudd as co-counsel.

Rosenzweig sought an evaluation of Kemp at the Arkansas state hospital in anticipation of a defense of not guilty by reason of mental disease or defect. The state forensic psychologist found that Kemp was competent to stand trial, was able to appreciate the criminality of his conduct, was able to conform his conduct to the requirements of the law, and was able to assist with the preparation of his defense. Kemp was diagnosed with alcohol abuse, alcohol dependence, cannabis abuse, and personality disorder, not otherwise specified, and was found to possess an IQ of 90. Rosenzweig thereafter renewed an earlier motion for the appointment of an independent mental health expert, which the court granted.

Rosenzweig retained psychologist James Moneypenny, Ph.D., to evaluate Kemp. After interviewing Kemp and Kemp's mother and reviewing the state hospital file, the criminal history report, and Kemp's school records, Dr. Moneypenny diagnosed Kemp with alcohol abuse and personality disorder with prominent antisocial features.

In late September 1994, the state disclosed that it would present evidence at the penalty phase of trial that Kemp previously had committed another violent felony. In response to Rosenzweig's motion, the court ordered the state to provide information about any such felonies. The state then disclosed the following incidents: in December 1986, Kemp struck Becky in the nose, causing it to break; in late 1986, Kemp struck Becky in the face, causing a cut near her eye that required five stitches; on an unspecified date, Kemp struck Becky in the face and broke her nose for a second time; weeks before the murders, Kemp pulled a gun on Becky and his mother, threatening to kill them; and two weeks before the murders, Kemp dragged a woman with his car. Rosenzweig moved for a continuance or, in the alternative, to exclude any evidence of prior violent felonies. During a pretrial hearing, the court decided to exclude the evidence because the state had not prosecuted Kemp for any of the offenses, rejecting the state's argument that the law did not require that Kemp be prosecuted or convicted for the evidence to be admissible.

Trial began on November 28, 1994. Defense counsel pursued a theory of imperfect self-defense: that Kemp had overreacted to what he perceived to be a threat because he was intoxicated and suffered from alcoholism and a personality disorder, such that, in Rosenzweig's words, the murders were "a grossly aberrational event in Mr. Kemp's life fueled by alcohol."

In his opening statement, Rosenzweig told the jury that the evidence would show that Kemp did not act with premeditation and deliberation, but rather that he mistakenly believed that he was acting in self-defense. The state called Becky Mahoney and Bill Stuckey to testify about what had occurred the night of the murders. On cross-examination, Becky testified that she and Kemp together had consumed approximately two cases of beer on the afternoon of October 4, 1993, and that they drank even more after arriving at Wayne's trailer. Stuckey testified on cross-examination that Kemp had been drinking heavily and that Kemp had said that he was threatened. The state presented evidence that the bullets from the bodies of three of the victims had been fired from the .22 Ruger semi-automatic rifle found in Kemp's residence and that the .22 caliber shell casings recovered from Helton's trailer were the same brand as the shells that were located in Kemp's truck. The state forensic pathologist who performed the autopsies testified that Wayne had been shot four times; Cheryl, five times; Sonny, twice; and Bubba, once. Rosenzweig did not call any witnesses.

The jury returned guilty verdicts on each of the four counts of capital murder, and the case proceeded to sentencing. The state sought the death penalty on each count of conviction based on two aggravating circumstances: (1) that in the commission of capital murder, Kemp knowingly created a great risk of death to a person other than the victim, and (2) that the capital murder was committed for the purpose of avoiding or preventing arrest.

In Kemp's penalty phase opening statement, co-counsel Rudd reiterated the defense theory that Kemp had been threatened and was under mental distress when he thought that he was acting in self-defense. She explained that Kemp's "abusive childhood resulted in the type of person that [Kemp] is today," as reflected in the diagnoses of alcoholism and personality disorder with antisocial features.

Kemp's former employer testified that Kemp had been a good worker and a skilled cabinetmaker. Kemp's mother Lillie then took the stand and explained that Kemp's father Verlon was a mean alcoholic, who seemed to hate Kemp, always referring to him as dumb, stupid, and lazy and calling him a "[s]tupid little son of a bitch or stupid little . . . jackass." When Kemp was an infant, Verlon would spank him if he cried or "pick him up and just shake him good and throw him back down on the bed." Lillie explained that Verlon whipped Kemp and his brother Brad with a belt if they were too loud, with the result that they learned to stay away from him. Lillie recounted the following incident, which occurred when Kemp was a teenager:

> [H]is father got up and run after [Kemp], grabbed him around the neck, and was choking him. And he choked [Kemp] until he turned blue and [Kemp] almost quit breathing. . . . And we were begging [Verlon] to turn him loose, that he was hurting him. And [Verlon] would not. He just kept on. So, I just picked up this Pepsi bottle and hit him right over the head with it and made him turn my son loose, because that's all I could do. I laid his head open.

Lillie further testified that Verlon had threatened to kill Kemp, that Verlon did not think the boys should complete school, and that Verlon had started giving Kemp beer when he was only seven or eight years old.

Dr. Moneypenny testified that Kemp was an alcoholic and manifested a personality disorder with prominent antisocial features, which is characterized by "an inability to manage impulses" and "an inability to identify with other peoples'

-6-

emotions." He explained that the disorder is often a coping mechanism for individuals who have been abused, allowing them to deal "with their own terror, their own turmoil, their own problems." Dr. Moneypenny testified that a person with Kemp's diagnoses has a heightened sense of danger and is sensitive to perceiving threats, with alcohol intoxication increasing the likelihood of misperception. Dr. Moneypenny opined that Kemp was under a great deal of pressure at the time of the murders and that his ability to conform his conduct to the requirements of the law was impaired by the individual and combined effects of his mental condition and his intoxication. During closing argument, co-counsel Rudd discussed the relationship between the abuse Kemp had suffered as a child, his alcoholism and personality disorder, and his impaired ability to act in a rational manner.

The jury unanimously found that both aggravating circumstances existed. The jury also unanimously found that two mitigating circumstances existed: that Kemp had grown up in an environment of abuse and neglect and that his father had provided an example of extreme violent reactions to situations. After weighing the aggravating and mitigating circumstances, the jury determined that death was the appropriate sentence on each count of conviction.

On direct appeal, the Arkansas Supreme Court affirmed the convictions, but reversed three of the death sentences, concluding that the evidence was insufficient to support the "avoiding arrest" aggravating circumstance on the counts related to Wayne, Cheryl, and Sonny. Kemp I, 919 S.W.2d at 955. On remand, the circuit court scheduled the resentencing trial for June 1997. Attorney Willard Proctor served as Rosenzweig's co-counsel during the resentencing proceedings.

At resentencing, the state relied solely on the aggravating circumstance that Kemp had knowingly created a great risk of death to another person. In his opening statement, Rosenzweig conceded the aggravating circumstance and set forth the defense theory that Kemp mistakenly believed he was acting in self-defense. The

evidence presented at resentencing was similar to that from the original trial, but less effective. Kemp's employer's earlier testimony was read to the jury. Lillie Kemp and Dr. Moneypenny testified in person. As the district court observed, "Perhaps it was the passage of time, or the fact that the proceeding was the second time through. But the transcript shows counsel working harder and getting less from both these witnesses." D. Ct. Order of Oct. 6, 2015, at 30 (citations omitted).

On each of the three remaining counts, the jury unanimously found that Kemp had created a great risk of death to another person. Although the jury did not unanimously find any mitigating circumstances, one or more jurors found that the following circumstances probably existed: that the capital murders were committed while Kemp was under extreme mental or emotional disturbance, that Kemp had the ability to be a productive member of society in prison, and that Kemp grew up in an environment of abuse and alcoholism. The jury concluded that the aggravating circumstance outweighed any mitigating circumstances and that death was the appropriate sentence on each count.

After the Arkansas Supreme Court affirmed the three additional death sentences, Kemp v. State, 983 S.W.2d 383 (Ark. 1998), Kemp moved for postconviction relief under Rule 37.5 of the Arkansas Rules of Criminal Procedure. Postconviction counsel obtained several boxes comprising Rosenzweig's file on the case.[2] In deciding which claims to raise in the motion, postconviction counsel relied entirely on Rosenzweig's advice and did not plead a claim of ineffective assistance of trial counsel for failing to adequately investigate or present mitigating evidence. The circuit court denied relief after an evidentiary hearing, and the Arkansas Supreme Court ultimately affirmed the denial of postconviction relief. See Kemp v. State, 60 S.W.3d 404 (Ark. 2001) (remanding for findings of fact and conclusions of law);

---

[2]Postconviction counsel died in 2007. Rosenzweig's file has not been located.

Kemp v. State, 74 S.W.3d 224 (Ark. 2002) (affirming amended order denying postconviction relief).

With the assistance of new counsel, Kemp timely filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in federal district court in February 2003. Federal proceedings were stayed and held in abeyance while Kemp exhausted state court remedies on an amended petition for postconviction relief. The Arkansas circuit court denied Kemp's motion for leave to file an amended petition, and in December 2009, the Arkansas Supreme Court dismissed Kemp's appeal for lack of jurisdiction because the mandate from his previous postconviction proceeding had not been recalled. Kemp v. State, 2009 WL 4876473, *1 (Ark. Dec. 17, 2009). The Arkansas Supreme Court later denied Kemp's motion to recall the mandate and his application to reinvest the circuit court with jurisdiction to consider a petition for writ of error *coram nobis*.

Having exhausted his state court remedies, Kemp filed an amended petition for a writ of habeas corpus in federal district court in December 2010, and he thereafter filed a second amended petition. Kemp argued, among other things, that he was denied effective assistance of trial counsel based on Rosenzweig's failure to adequately investigate and present mitigating evidence related to childhood abuse, fetal-alcohol exposure, and post-traumatic stress disorder. That claim was procedurally defaulted, however, because it had not been asserted in state postconviction proceedings. Kemp thus argued that the default should be excused based on postconviction counsel's constitutionally deficient performance in failing to assert the claim in state court.

The district court initially determined that any ineffective assistance of postconviction counsel could not constitute cause to excuse the procedural default. See D. Ct. Order of June 28, 2012, at 27-28 (citing Dansby v. Norris, 682 F.3d 711, 729 (8th Cir. 2012), *vacated*, 569 U.S. 1015 (2013), *remanded to* 766 F.3d 809 (8th

Cir. 2014)).  But in light of <u>Trevino v. Thaler</u>, 569 U.S. 413 (2013), the district court granted Kemp's motion to reconsider, D. Ct. Order of Mar. 17, 2014, and also granted an evidentiary hearing to decide whether the procedural default should be excused, see D. Ct. Order of Aug. 14, 2014, at 4 (citing <u>Sasser v. Hobbs</u>, 735 F.3d 833, 853-54 (8th Cir. 2013)).

Over the course of eight days, Kemp presented thirteen witnesses and 145 exhibits.  Kemp's two half-sisters, an aunt, a cousin, and a friend from his teenage years testified in person.  Among those who testified by affidavit were Kemp's mother, his brother, his ex-wife, a former longtime girlfriend, and several other family members.  Kemp presented volumes of documentary evidence, including a 1961 emergency petition for divorce that Lillie brought against Verlon, medical records from Verlon's 1977 overdose of barbiturates and alcohol, and court records and newspaper articles describing Verlon's criminal conduct in the 1950s and early 1960s.  The district court summarized the evidentiary hearing as follows:  "Kemp presented compelling evidence not introduced at trial: a deep family history of poverty and mental illness; a routine of trauma during childhood; and Kemp's mother, Lillie, drank alcohol heavily when she was pregnant with him."  D. Ct. Order of Oct. 16, 2015, at 26.

Kemp also offered the opinions of the following experts:  Dr. Paul Connor, a neuropsychologist; Dr. Richard Adler, a psychiatrist; Dr. Natalie Novick Brown, a psychologist; and Dr. George W. Woods, a psychiatrist.  They diagnosed Kemp with partial fetal-alcohol disorder based on Lillie's alcohol consumption during her pregnancy; Kemp's facial anomalies and childhood developmental difficulties; and Kemp's deficits in cognitive functioning.  The experts testified that his *in utero* exposure to alcohol has left Kemp with organic brain damage, which impairs his executive functioning and behavior control, especially in unfamiliar and stressful situations.  Dr. Woods also testified that Kemp suffers from post-traumatic stress

disorder caused by a childhood filled with physical, psychological, and emotional abuse.

Former attorney Rosenzweig testified over the course of three days. With respect to trial strategy, he explained that he had decided to concede that Kemp had killed the four victims and to focus on reducing the charges from "capital murder to something less." Rosenzweig was well aware that Arkansas did not recognize voluntary intoxication as a defense to a criminal charge, and he knew that the case did not present "a completely legitimate self-defense argument." In light of Kemp's explanation that he had been threatened before he left the trailer and that Wayne had confronted him with a gun, as well as Kemp's intoxication and his mental health diagnoses, Rosenzweig decided to proceed with an imperfect self-defense theory.

Rosenzweig testified that he had primarily relied upon Kemp, Lillie, and Kemp's aunt Glenavee Walker to gain an understanding of Kemp's social history. Rosenzweig also interviewed a former employer and a childhood friend of Kemp's. Kemp's brother Brad refused to talk to Rosenzweig, despite requests by Rosenzweig and Lillie, telling Rosenzweig that Kemp should die for what he had done. Rosenzweig traveled to Houston, Missouri, to gather Kemp's school records, talk to potential witnesses, and visit the local courthouse. Rosenzweig also conferred with Dr. Moneypenny.

During his investigation, Rosenzweig learned that Kemp's father was deceased and that he had been an alcoholic who had physically and emotionally abused his wife and children. Rosenzweig also learned that although Kemp was an alcoholic, he had been a good worker. Rosenzweig did not get the impression that Lillie had been a heavy drinker, nor did he "pick up on any fetal alcohol issues." In deciding whom to call as witnesses during the penalty phase, Rosenzweig decided against calling Glenavee Walker, who had helped Kemp after his escape from jail, lest her testimony open the door to the state's presentation of evidence regarding the escape,

-11-

which Rosenzweig believed would be disastrous to the defense. Rosenzweig also was careful to avoid opening the door to evidence of Kemp's prior violent felonies.

For resentencing, Rosenzweig relied on his knowledge of Kemp's case and the investigation that he had completed prior to the first trial. He believed that the first jury had found Lillie credible, based on its unanimous mitigation findings. Rosenzweig believed that Dr. Moneypenny also had been a good witness, testifying that he was one of the few psychologists at that time who were willing to testify in capital-murder cases. Accordingly, he decided to have Lillie and Dr. Moneypenny testify at resentencing, and he obtained funds for Dr. Moneypenny to reevaluate Kemp. Rosenzweig tried again to talk with Kemp's brother, who again refused to do so. Rosenzweig remained concerned about opening the door to evidence regarding Kemp's escape or his prior violent felonies.

Rosenzweig acknowledged that he had failed to take steps that would have helped Kemp's mitigation case. He testified that, in retrospect, his investigation was not comprehensive and "certainly not anywhere near as full as I would . . . do now." Rosenzweig faulted himself for not seeking funds for an investigator, for not fully researching Kemp's family history, and for not discovering that Lillie drank alcohol excessively while pregnant with Kemp.

As set forth more fully below, the district court concluded that there were no substantial claims of deficient performance and that Kemp thus could not overcome the procedural default. As set forth earlier, the district court dismissed the petition for a writ of habeas corpus and issued a certificate of appealability.

## II. Discussion

We review *de novo* the question whether Kemp's claim is procedurally defaulted. Arnold v. Dormire, 675 F.3d 1082, 1086 (8th Cir. 2012). "Ordinarily, a

federal court reviewing a state conviction in a 28 U.S.C. § 2254 proceeding may consider only those claims which the petitioner has presented to the state court in accordance with state procedural rules." Id. (quoting Beaulieu v. Minnesota, 583 F.3d 570, 573 (8th Cir. 2009)); see Martinez v. Ryan, 566 U.S. 1, 9 (2012) ("[A] federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule."). It is undisputed that the constitutional claim at issue here is procedurally defaulted because Kemp's state postconviction counsel did not present it to any Arkansas state court in accordance with state procedural rules. See Barrett v. Acevedo, 169 F.3d 1155, 1161 (8th Cir. 1999) (en banc) ("If a petitioner has not presented his habeas corpus claim to the state court, the claim is generally defaulted.").

"A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." Martinez, 566 U.S. at 10. Ineffective assistance of state postconviction counsel generally does not provide cause to excuse a procedural default. See Coleman v. Thompson, 501 U.S. 722, 752-55 (1991). A narrow exception to this general rule permits federal courts to find cause to excuse procedural default in Arkansas where:

> (1) the claim of ineffective assistance of trial counsel was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; and (3) the state collateral review proceeding was the "initial" review proceeding with respect to the "ineffective-assistance-of-trial-counsel claim."

Dansby, 766 F.3d at 834 (quoting Trevino, 569 U.S. at 423); see Sasser, 735 F.3d at 853 (applying this exception to cases arising from Arkansas). For purposes of these federal habeas proceedings, the state has not disputed that Kemp had ineffective counsel during state postconviction review or that those proceedings were the initial

review proceedings with respect to Kemp's claim of ineffective assistance of trial counsel. In determining cause, then, the issue before the district court was whether Kemp had presented a substantial claim of ineffective assistance of trial counsel. A "substantial" claim is one that has "some merit." Martinez, 566 U.S. at 14.

To determine whether Kemp had presented a substantial claim, the district court considered the merits of Kemp's underlying ineffective assistance of trial counsel claim. To establish the underlying claim, Kemp was required to demonstrate that trial counsel's performance was deficient and that the deficient performance prejudiced the defense. See Strickland v. Washington, 466 U.S. 668, 687 (1984). The district court concluded that Kemp had presented a substantial claim of prejudice, but not of deficient performance. The certificate of appealability addresses only deficient performance—that is, whether trial counsel was constitutionally ineffective for failing to adequately investigate and present mitigating evidence related to childhood abuse, fetal-alcohol exposure, and post-traumatic stress disorder. Because the Arkansas state courts did not consider or decide the issue, we review *de novo* the district court's determination that Kemp's trial counsel was not deficient. See Porter v. McCollum, 558 U.S. 30, 39 (2009) (per curiam) (citing Rompilla v. Beard, 545 U.S. 374, 390 (2005)). Our review of counsel's performance is highly deferential. Strickland, 466 U.S. at 689.

Counsel's performance was deficient if it fell below an objective standard of reasonableness. Id. at 688. We measure reasonableness under the prevailing professional norms at the time of counsel's performance. Bobby v. Van Hook, 558 U.S. 4, 7 (2009) (per curiam); Strickland, 466 U.S. at 688. We make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 at 689.

Kemp argues that Rosenzweig failed to conduct the thorough investigation required in death penalty cases and failed to continue the investigation into promising areas of mitigation. Trial counsel has a duty to conduct a reasonable investigation or to make a reasonable determination that an investigation is unnecessary. Id. at 691. When counsel makes strategic choices after a thorough investigation of law and facts, those decisions are "virtually unchallengeable." Id. at 690. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91.

We first consider whether it was reasonable for trial counsel to complete the mitigation investigation without the help of an investigator or mitigation specialist. Kemp contends that "[p]revailing professional norms in 1994 and 1997 called for 'a fully staffed defense team [with] two lawyers and an investigator and a mitigation specialist.'" See Appellant's Br. 59 (alteration in original) (quoting the testimony of defense witness Professor Sean O'Brien). Kemp argues that in light of these norms, as well as a 1991 Arkansas Supreme Court decision overruling a statute that limited attorney fees and expenses to $1,000, "it was unreasonable for trial counsel not to request funds to pay an investigator and/or mitigation specialist." Appellant's Br. 62 (citing Arnold v. Kemp, 813 S.W.2d 770, 775 (Ark. 1991)). In support of this argument, Kemp relies on Professor O'Brien's expert opinion and the 1989 American Bar Association's (ABA) Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, which commentary states that counsel cannot adequately perform the necessary background investigation without the assistance of investigators and others.

"No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89; see Rompilla, 545 U.S. at 381 ("A standard of

-15-

reasonableness applied as if one stood in counsel's shoes spawns few hard-edged rules . . . ."). Although the Supreme Court has looked to sources such as the ABA Standards in assessing the reasonableness of counsel's performance, see Rompilla, 545 U.S. at 387; Wiggins v. Smith, 539 U.S. 510, 524 (2003), the Court has emphasized that such sources serve only as guides, Strickland, 466 U.S. at 688. In 1994 and 1997, there was no absolute requirement that counsel hire—or seek funds to hire—an investigator or mitigation specialist. Cf. Strong v. Roper, 737 F.3d 506, 520 (8th Cir. 2013) (concluding that trial counsel made a reasonable decision in 2001 to forgo hiring a mitigation specialist and instead develop the capital defendant's mitigation case themselves). Rather, prevailing professional norms required trial counsel "to conduct a thorough investigation of the defendant's background." Williams v. Taylor, 529 U.S. 362, 396 (2000); see Van Hook, 558 U.S. at 9 ("[T]he Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." (citation omitted)).

We conclude that Rosenzweig's investigation into Kemp's background satisfied his Strickland obligation, and thus his decision to complete the investigation himself was reasonable. Rosenzweig learned of Verlon's abuse from Kemp himself, as well as from his mother. As the district court explained, "Brad would have been an excellent source" of information on Kemp's tumultuous childhood, "[b]ut he closed the door hard on helping." D. Ct. Order of Oct. 6, 2015, at 40. Rosenzweig spoke with Kemp's childhood friend who knew of Verlon's abuse, but decided that Lillie's testimony would adequately describe Kemp's life history. As earlier set forth, Rosenzweig also met with Kemp's aunt, but decided against calling her as a witness for fear of opening the door to evidence of Kemp's escape from jail. Dr. Moneypenny's evaluation and description of the adverse mental health effect of Kemp's violence-filled childhood enabled counsel to better explain it to the jury. At sentencing and resentencing, Rosenzweig capably presented the evidence of that childhood abuse through Lillie Kemp's and Dr. Moneypenny's testimony.

-16-

We further conclude that the decision not to interview more distant family members was reasonable. Among the witnesses interviewed by habeas counsel were Kemp's ex-wife and an ex-girlfriend, as well as his step-mother, half-siblings, step-siblings, cousins, aunts, an uncle, and a friend from his teenage years. The information gathered provided a more detailed view of the abuse Kemp and Lillie had endured at Verlon's hands and of the terror and violence that permeated Kemp's childhood. Some family members also testified about Lillie's heavy drinking while pregnant. Hindsight may suggest that Rosenzweig should have interviewed more witnesses and sought additional documents, but when we consider the circumstances of the investigation and evaluate the investigation from Rosenzweig's perspective in 1994 and 1997, we conclude that it was not unreasonable of him to forgo seeking out further sources. See Van Hook, 558 U.S. at 11 ("[T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative, and the search for it distractive from more important duties.").

Rosenzweig was faced with the burden of preparing a defense in a quadruple-murder trial. His goal was to reduce the penalties to anything less than death sentences. He conducted an investigation that was thorough in the then-extant circumstances and reasonably decided to pursue a theory of imperfect self-defense. He capably presented evidence of Kemp's traumatic childhood and its effect on Kemp's ability to perceive and react to threats and danger. He convinced the sentencing jury that Kemp had been reared in an environment of abuse and alcoholism and that his father had provided a living example of extremely violent reactions to situations. At resentencing, Rosenzweig's advocacy again convinced some members of the jury that Kemp had grown up in an environment of abuse and alcoholism. He also effectively kept from both juries evidence regarding Kemp's escape from prison and his prior violent felonies.

That Rosenzweig did not discover a potential diagnosis of partial fetal-alcohol disorder did not render his investigation inadequate or his performance deficient.

-17-

Rosenzweig testified that he had attended a conference in 1991 that included a plenary session on fetal-alcohol exposure as a mitigation defense. But Lillie had described her pregnancy as unremarkable and did not disclose that she had consumed alcohol while pregnant with Kemp. We agree with the district court that Rosenzweig's investigation revealed "hints, though, not red flags" of Kemp's possible fetal-alcohol exposure, but that "[w]hat was missing in 1994 and 1997 was any solid indication that Lillie drank alcohol heavily while pregnant." D. Ct. Order of Oct. 6, 2015, at 37. In the context of what was known in the mid-1990s of fetal-alcohol exposure as a mitigation defense and the information Rosenzweig discovered in his background investigation, we cannot say his performance was deficient for not pursuing evidence that might have led to a diagnosis of partial fetal-alcohol disorder.

We conclude that Rosenzweig's decision to hire Dr. Moneypenny to evaluate the effect of Kemp's abusive childhood on his mental health was reasonable in the circumstances. Rosenzweig provided to Dr. Moneypenny Kemp's school records, criminal history report, and a copy of the state forensic evaluation report. Dr. Moneypenny evaluated Kemp and interviewed Lillie, and thereafter conferred with Rosenzweig. Although Dr. Woods testified at the habeas hearing that the information available to Dr. Moneypenny in 1994 and 1997 indicated that Kemp suffered from post-traumatic stress disorder, we agree with the district court that

> Dr. Moneypenny's diagnosis of antisocial personality disorder was not so lacking in factual basis that Kemp's lawyer's work was constitutionally defective. Worthington v. Roper, 631 F.3d 487, 502 (8th Cir. 2011). Many of the PTSD indicators are similar to those for antisocial personality disorder. Without the diagnosis or the label, the essence of PTSD was put before the juries in Dr. Moneypenny's testimony as well as the abuse evidence.

D. Ct. Order of Oct. 6, 2015, at 39.

Rosenzweig did not fail "to act while potentially powerful mitigating evidence stared [him] in the face." Van Hook, 558 U.S. at 11. Nor did he fail to locate witnesses or obtain documents that any reasonable attorney would have pursued. See id. His decision not to seek mitigating evidence in addition to that "already in hand fell well within the range of professionally reasonable judgments." Id. at 11-12 (internal quotation marks and citation omitted). The additional evidence presented during the evidentiary hearing confirmed Lillie's description of Verlon Kemp as an especially mean child-hating, pain-inflicting alcoholic, evidence that Rosenzweig himself now understandably regrets that he did not obtain and present. When viewed in light of the circumstances that he was faced with at the time, however, we cannot say that his performance fell below constitutional requirements. See Strickland, 466 U.S. at 689 (explaining that "the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation," but rather "to ensure that criminal defendants receive a fair trial."); see also Burger v. Kemp, 483 U.S. 776, 794 (1987) (reiterating that "in considering claims of ineffective assistance of counsel, '[w]e address not what is prudent or appropriate, but only what is constitutionally compelled'" (alteration in original) (quoting United States v. Cronic, 466 U.S. 648, 665 n.38 (1984)).

We affirm the dismissal of Kemp's second amended petition for a writ of habeas corpus. We decline to consider the following issues, which Kemp raised on appeal but are beyond the scope of the certificate of appealability: whether Kemp suffered prejudice at the guilt phase by his counsel's failures and whether the district court's finding of prejudice at the penalty phase renders Kemp's death sentences unreliable. See Armstrong v. Hobbs, 698 F.3d 1063, 1068-69 (8th Cir. 2012) (recognizing this court's discretion to consider issues beyond those specified in a certificate of appealability, but declining to do so).

———————————————