Cite as 2021 Ark. 173

# SUPREME COURT OF ARKANSAS

No. CR-95-549

|  |  |
|---|---|
| | **Opinion Delivered:** October 7, 2021 |
| TIMOTHY WAYNE KEMP<br>PETITIONER | |
| | PETITION TO REINVEST |
| V. | JURISDICTION IN THE TRIAL |
| | COURT TO CONSIDER A |
| | PETITION FOR A WRIT OF |
| STATE OF ARKANSAS | ERROR CORAM NOBIS [PULASKI |
| RESPONDENT | COUNTY CIRCUIT COURT, FIRST |
| | DIVISION, NO. 60CR-93-2903] |
| | |
| | HONORABLE MARION A. |
| | HUMPHREY, JUDGE |
| | |
| | PETITION DENIED. |

**SHAWN A. WOMACK, Associate Justice**

Nearly three decades have passed since Timothy Kemp murdered David Wayne
Helton, Richard "Bubba" Falls, Robert "Sonny" Phegley, and Sonny's daughter Cheryl
Phegley. Kemp has never denied killing his victims. The dispute has instead centered on
what precipitated the shootings. From the time of his arrest, Kemp has insisted he acted in
self-defense. The State of Arkansas, on the other hand, maintains that he slaughtered his
victims in an anger-fueled rampage. The jury rejected Kemp's version of events and
sentenced him to death for each murder.

Kemp now claims he was convicted and sentenced to death in violation of the rule
in *Brady v. Maryland*, 373 U.S. 83 (1963), which requires the prosecution to disclose
evidence in its possession that is material to the defense. He accuses the prosecution of

withholding material evidence that would have prevented his convictions and sentences by bolstering his assertion of self-defense. To rectify the alleged *Brady* violations, Kemp asks this court to reinvest jurisdiction in the circuit court so that he may pursue a writ of error coram nobis. We decline to do so.

I.

Kemp spent the day of October 4, 1993, drinking and driving around with his longtime girlfriend, Becky Mahoney. That evening, the couple stopped by Wayne Helton's trailer to visit with Wayne, Sonny Phegley, and Cheryl Phegley. Bubba Falls, whom the couple did not know, was also there. After hours of dancing and drinking, Kemp became angry with Becky. Jealous that she had danced with Wayne, Kemp wanted her to leave with him. Fearing Kemp's temper, she refused. Cheryl intervened and told Kemp to leave. As he drove away in his truck, he warned Becky she would be sorry for not leaving.

Kemp made good on his threat. After driving—either around the neighborhood or to his mother's house, where he and Becky lived—Kemp returned to the trailer with his .22 rifle. His truck had a distinctive sound, so he parked roughly fifty yards away, walked to the trailer door, and knocked. When Wayne opened the door, Kemp opened fire. He shot Wayne four times: twice each in his face and chest. The facial wounds were at close range and consistent with Wayne lying face upward when shot. As Kemp recounted to his friend Bill Stuckey later that night, Wayne fell "like a sack of taters." Kemp then shot Sonny in the arm and head. Bubba, whom Kemp told Stuckey was "just in the wrong place at the wrong time," was shot in the chest. Kemp turned last to Cheryl. He followed her as she crawled down the hallway and into a nearby bedroom. As she screamed out for her life,

Kemp assured her that she was going to die before gunning her down. Kemp shot Cheryl five times, including twice in the back and once in the head.

Becky was the sole survivor. After hearing the knock at the door, she feared Kemp had returned for her. She was told to hide in the bedroom, and the others would tell Kemp she had walked home. As she headed toward the bedroom, she paused in the hallway. Once she heard gunfire and saw Bubba and Cheryl fall to the floor, she ran into the back bedroom closet. Kemp did not find her. Becky emerged after the gunfire ceased and saw Wayne, Sonny, and Bubba on the floor. She called 911. While on the phone, she heard Kemp's truck start up outside. Officers soon arrived and found the bodies of the four victims inside the trailer. Wayne and Sonny had been shot down near the front door. An unfired .32 caliber pistol was on the floor between them. The magazine contained seven live rounds but no round was chambered. Bubba's body was found on the other end of the living room. After following a trail of spent .22 casings, officers found Cheryl's body partially inside the front bedroom closet.

Meanwhile, Kemp went home, hid the rifle in his mother's closet, and changed clothes. He then drove to Stuckey's house for gas money to get out of town. Kemp told Stuckey he had shot Wayne, Sonny, Cheryl, and "some guy he didn't know" because "[t]hey ran him off and kept Becky there and wouldn't let her leave with him." He mentioned that Cheryl had "started all the argument" and "wouldn't let Becky leave with him or said that Becky did not have to leave with him and that he needed to leave." After that, Kemp said he went home, retrieved his gun, returned to the trailer, and shot everyone except Becky, who he was unable to find. Kemp told Stuckey he could hear his victims

gasping for breath as he left the trailer. Kemp was soon arrested at Stuckey's house and charged with four counts of capital murder.

Given the evidence of guilt, trial counsel strategically focused on a mitigation case at the 1994 trial. Counsel argued that a heavily intoxicated Kemp, whose personality had been misshapen by an abusive and violent upbringing, overreacted and lashed out in imperfect self-defense. The Pulaski County jury did not accept that argument as valid. He was convicted and sentenced to death for each murder. We affirmed the convictions but only affirmed the sentence for Bubba's murder based on issues surrounding the aggravating circumstances. *See Kemp v. State*, 324 Ark. 178, 919 S.W.2d 943 (1996). On remand, the jury again imposed death. We affirmed. *See Kemp v. State*, 335 Ark. 139, 983 S.W.2d 383 (1998).

We later affirmed the denial of Rule 37 relief. *See Kemp v. State*, 348 Ark. 750, 74 S.W.3d 224 (2002). In 2005, the federal district court stayed Kemp's habeas case so he could return to state court to exhaust ineffective-assistance claims. During the stay, Kemp filed a successive Rule 37 petition. We dismissed for lack of jurisdiction because the mandate had not been recalled. In 2010, we denied his motion to recall the mandate. Later that year, we denied by syllabus entry his request to reinvest jurisdiction in the circuit court for coram nobis relief. In that request, Kemp alleged the prosecution withheld evidence about Becky's medical and psychiatric history. He also alleged that the prosecution withheld collateral details of Stuckey's criminal convictions occurring after trial and before resentencing.

Kemp returned to federal court. He claimed that in 2013, he was given prosecutor notes that indicated the State gave false information and withheld evidence. According to

4

the notes, Becky stated Wayne had been "messing" with Kemp on the night of the murder and had a pistol, which he planned to use to scare Kemp if he returned. Kemp also claimed it showed there was a rifle in the trailer that did not belong to him. The federal district court concluded Kemp failed to demonstrate facts sufficient to establish by clear and convincing evidence that no reasonable fact-finder would have found him guilty absent the constitutional error. *See Kemp v. Kelley*, No. 5:03–cv–55–DPM, 2015 WL 5842538 (E.D. Ark. Oct. 6, 2015). The court observed that (1) whether the group provoked Kemp was immaterial given the time Kemp had to cool off before returning to murder everyone; (2) sufficient evidence supported guilt even without Becky's testimony; and (3) this court previously considered the issue of another weapon and determined it would not have changed the outcome. *Id*. The federal district court later denied Kemp's request for a second stay in order to exhaust the prosecutor-note claim in state court, holding that Kemp had not diligently pursued the claim and that it lacked factual merit. *See Kemp v. Hobbs*, No. 5:03–cv–55–DPM, 2012 WL 2505229 (E.D. Ark. June 28, 2012). The Eighth Circuit affirmed. *See Kemp v. Kelley*, 924 F.3d 489 (8th Cir. 2019).

It is with this background in mind that we turn to Kemp's second petition to reinvest jurisdiction in the circuit court to pursue coram nobis relief.

## II.

A petition like Kemp's must surmount a high bar. A writ of error coram nobis is an extraordinarily rare remedy. Indeed, it is more known for its denial than its approval. *See Newman v. State*, 2009 Ark. 539, at 4–6, 354 S.W.3d 61, 65. Under established precedent, coram nobis proceedings are attended by a strong presumption that the conviction is valid.

*Id.* The writ is allowed only under compelling circumstances to achieve justice and to address errors of the most fundamental nature. *Id.* It functions to secure relief from a judgment rendered while there existed some fact that would have prevented its rendition had it been known to the circuit court and which, through no negligence or fault of the defendant, was not brought forward before rendition of judgment. *Id.* Where the writ is sought after judgment has been affirmed on appeal, the circuit court may entertain the petition only after this court grants permission. *Id.* We will do so only when it appears that the proposed attack on the judgment is meritorious. *Id.* In making such a determination, we look to the reasonableness of the allegations within the petition and to the existence of the probability of the truth thereof. *Id.*

The writ is available only to address errors falling within specific categories including, as relevant here, material evidence withheld by the prosecution. *See Ventress v. State*, 2015 Ark. 181, at 2, 461 S.W.3d 313, 315 (per curiam). This category is consistent with the violation of a defendant's right under *Brady v. Maryland*, 373 U.S. 83, to be shown exculpatory evidence that is in the prosecution's possession. *See Howard v. State*, 2012 Ark. 177, at 8, 403 S.W.3d 38, 44. There are three elements of a Brady violation: (1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued. *Id.*

Kemp claims the writ is warranted to address four issues. Each issue is based on an alleged *Brady* violation. First, he points to the prosecutor's note discovered in 2013 regarding Mahoney's conversation with Wayne in the time between Kemp's departure and return.

6

Second, Kemp learned in 2013 that a rifle was purportedly discovered in the trailer after the crime scene was processed. Third, Kemp reasserts his 2010 claim that prosecutors failed to obtain and disclose records regarding Becky's emergency psychiatric care before and during trial. And last, Kemp reasserts the prosecutor's failure to disclose collateral details regarding Stuckey's criminal convictions occurring after trial but before resentencing.

The State opposes reinvestiture on two bases. It first contends that Kemp failed to diligently pursue his claims. Even if the petition were timely, the State argues that the claims within the petition are wholly without merit. Because we resolve this matter on the merits, and agree with the State, we need not consider whether Kemp diligently pursued his claims.

A.

We begin with Kemp's argument regarding statements that Becky made during an interview with the prosecutor. According to the prosecutor's notes, Wayne had shown Becky a pistol and told her that he planned to use it to scare Kemp should he return. The note specifically stated that "Wayne showed Becky a pistol that he had + said he would use it to scare Tim." According to Kemp, this statement corroborated his version of events leading up to the murders that night. Even assuming the prosecution wrongfully failed to disclose this evidence, there is no prejudice under *Brady* and no reasonable probability that the outcome of the trial would have been different had defense counsel been provided with the evidence.

The prosecutor's note, at most, suggests that Becky saw a gun and was aware of a plan to "scare" Kemp should he return during a time that Kemp was not at the trailer. There is no suggestion in the notes that Kemp was indeed threatened with or saw a gun prior to

7

murdering his victims. Even so, the jury was well aware that a pistol not belonging to Kemp was at the crime scene. The unfired .32 caliber pistol found between Sonny's and Wayne's bodies was clear evidence that a gun, other than the murder weapon, was at the trailer that night. The jury was allowed to weigh that evidence against Kemp's claims of self-defense. It was also entitled to weigh the presence of that pistol against Becky's testimony that she had not seen a gun during the night. Based on the record, the alleged failure of the prosecution to disclose this note does not warrant granting Kemp's petition. There is no reasonable probability that Wayne's out of court statement to Becky during a period when Kemp was indisputably not at the trailer would have changed the outcome of his trial.

B.

For his second claim, the basis of which he discovered in 2013, Kemp asserts that a rifle found in Wayne's trailer by his girlfriend after investigators had processed the crime scene was suppressed evidence supporting his self-defense claims. This alleged information was discovered following a dispute between Wayne's ex-wife and his fiancée. After the murder, the fiancée claimed to have found a rifle in his trailer that she subsequently sold. In 2013, the fiancée provided Kemp with a declaration. However, there is no indication of how the declaration came to be created. Nor is there any explanation by the fiancée as to where in the trailer she found the rifle. Even assuming the veracity of the declaration, the mere existence of a rifle in the trailer does not implicate its use during the night of the crime.

Significantly, the record shows that officers searched the areas of the trailer where the murders occurred. Additionally, the investigator testified that he looked through the trailer for other weapons but did not find anything. If Kemp's recollection of events to

8

police were correct, a rifle would have been found in the area where the murders occurred. Four of the five individuals in the trailer were dead and could not have moved a rifle. There is no evidence that Becky hid or removed a rifle in the time between the murders and when police arrived. Indeed, she remained on the phone with the dispatcher until the police showed up. Thus, even if a rifle was somewhere in the trailer, there is no evidence to support the claim that it was present during the crime or used to threaten Kemp at any time.

C.

Kemp next claims he was deprived of access to Becky's medical and psychiatric records regarding PTSD treatment she received in the time leading up to his trial. He also claims he was wrongfully deprived of information regarding the involvement of the victim-witness unit of the prosecutor's office with helping her obtain that treatment. As noted above, this is not the first time Kemp has raised this claim to this court. It was first presented over a decade ago in his 2010 coram nobis petition. Once again, this claim fails to meet the standard for reinvestiture.

Kemp contends this information would have been favorable impeachment evidence. Though Becky testified that she had been in rehab since the murders, Kemp points out the prosecution did not disclose that Becky had been in rehab the day before her testimony. There is no evidence that the State had Becky's records. Had it obtained the records, there is nothing to suggest the records could have possibly benefitted Kemp. Indeed, Becky's care was sought specifically because of the resulting trauma from surviving the murders that night. If anything, this evidence could have been helpful to the State's victim-impact case. Moreover, even if the records could have been used to impeach Becky, there is no

9

reasonable chance that the records would have resulted in a different outcome given the overwhelming evidence of guilt.

D.

For his final point, Kemp contends that reinvesting jurisdiction is warranted because the prosecution downplayed Stuckey's legal troubles occurring between the 1994 trial and the 1997 resentencing. He suggests that Stuckey sugared his testimony at resentencing to please the prosecutor and secure lighter consequences for his criminal behavior. Had the prosecution disclosed the collateral details of Stuckey's criminal history, Kemp argues he could have attacked Stuckey's credibility before the jury. This argument is not new. Like the claim above, this argument was raised and rejected in Kemp's 2010 coram nobis petition. We are once again unpersuaded.

A comparison of Stuckey's testimony during trial and resentencing reveals no meaningful difference. Indeed, his testimony at both trials was virtually identical except for two statements. During both trials, Stuckey testified that Kemp showed up to his house in the middle of the night, awakened him, and borrowed gas money to get out of town. For the next hour or so, before police arrived, Kemp recounted the horrific details of the quadruple homicide he had committed earlier that night. During resentencing, Stuckey stated for the first time that Kemp characterized Wayne's falling to the ground "like a sack of taters" after Kemp shot him. He also stated that once police arrived, Kemp handed back the gas money he had borrowed and walked outside.

Kemp's effort to build an argument for the writ around these two statements is futile. They do not contradict any of his testimony and do not expand beyond what he testified to

10

during the first trial. The addition of these two statements does not support Kemp's claim that Stuckey expanded his testimony at resentencing as a means to please the prosecutor and receive favorable treatment for his recent legal issues. Simply put, disclosure of the collateral details surrounding Stuckey's criminal convictions do not create a reasonable probability that the jury would have reached a different conclusion during the resentencing trial. Reinvestiture is not warranted on this point.

III.

We decline to reinvest jurisdiction in the circuit court so that Kemp may pursue a writ of error coram nobis. Contrary to Kemp's view, there is no reasonable probability that disclosure of the evidence to the defense would have resulted in a different outcome. As a result, the proposed attack on the judgment is wholly without merit.

Petition denied.

KEMP, C.J., and HUDSON, J., concur.

**COURTNEY RAE HUDSON, Justice, concurring**. I agree with the majority that Timothy Wayne Kemp's application for coram nobis relief may be denied based on its lack of apparent merit, and I fully join that opinion. I write separately, however, to also emphasize Kemp's lack of diligence in pursuing the present application. Although there is no specific time limit in seeking a writ of error coram nobis, we have held that due diligence is required in making an application for relief, and in the absence of a valid excuse for the delay, the petition will be denied. *Scott v. State*, 2017 Ark. 199, 520 S.W.3d 262; *Echols v. State*, 354 Ark. 530, 127 S.W.3d 486 (2003). Due diligence requires that (1) the defendant be unaware of the fact at the time of trial; (2) the defendant could not have, in the exercise

11

of due diligence, presented the fact at trial; and (3) upon discovering the fact, the defendant did not delay in bringing the petition. *Scott*, *supra*.

Kemp admits that he discovered the facts giving rise to his current claims in 2013 while pursuing discovery in his federal habeas proceedings. However, he then waited seven years to bring the claims before this court. The State asserts that Kemp's pursuit of his claims in federal court does not excuse his seven-year delay and that his application should be denied on this basis.

I agree that Kemp has failed to demonstrate diligence. Kemp's petition and attached exhibits support his position that he was not aware of the new facts until 2013. However, he then purposely delayed filing his second application for error coram nobis relief until 2020, after the conclusion of his federal habeas proceedings and associated appeals. Kemp's September 2014 reply in federal district court recognized that a second application in state court was an available and potentially meritorious remedy for his *Brady* claims. Nonetheless, even after the district court dismissed his habeas petition, he instead chose to appeal rather than return to state court.

Kemp cites our decision in *Newman v. State*, 2009 Ark. 539, 354 S.W.3d 61, to support his contention that the federal litigation excused his delay. In *Newman*, we rejected the State's argument that the petitioner lacked diligence when he had chosen to first seek relief in federal court. However, we based our decision on the unique facts in that case and did not announce a blanket exception to the diligence requirement for those petitioners involved in federal litigation. The petitioner in *Newman* had meritorious claims of incompetence and had not cooperated with appointed counsel in postconviction

12

proceedings in state court, issues that are not present in Kemp's case. *Newman*, 2009 Ark. 539, at 11–12, 354 S.W.3d at 67–68. As Kemp asserts, we also relied on the State's inconsistency in *Newman* by first maintaining that state-court remedies were not available to Newman and then later arguing that the state-court petition should have been filed earlier. *Id*. at 12, 354 S.W.3d at 68. While Kemp claims that the State made the same inconsistent arguments here, it is clear from his pleadings in federal court that he was aware he could seek further state-court relief but chose not to do so until years later. Accordingly, the situation in *Newman* is distinguishable, and this court could have chosen to deny Kemp's application based on his lack of diligence rather than on its lack of apparent merit. *See also Pinder v. State*, 2012 Ark. 45, at 4 (per curiam) (stating that the petitioner cited "no authority in support of the proposition that pursuing other types of postconviction relief, such as a petition under Rule 37.1 or a petition for writ of habeas corpus in federal court, will excuse a delay in pursuing coram nobis relief"). Our coram nobis jurisprudence requires that a petitioner not delay in bringing claims to this court's attention, and I caution Kemp, as well as future petitioners, that pending federal proceedings will not necessarily excuse such a delay.

KEMP, C.J., joins.

*Julie Pitt Vandiver*, Ass't Fed. Pub. Def., for petitioner.

*Leslie Rutledge*, Att'y Gen., by: *Kent G. Holt*, Ass't Att'y Gen., for respondent.